# BRAGG v. METROPOLITAN STREET RAILWAY COMPANY, Appellant.

### Division One, December 21, 1905.

1. **APPELLATE PRACTICE: New Objections.** Objections to questions, whether they be hypothetical or otherwise, cannot be made for the first time in the appellate court. Where a specific objection was lodged below, appellant will be held to that specification on appeal; and a general objection below in a case where the evidence is competent for any purpose, cannot be given a specific turn or twist on appeal.

2. **EXPERT EXAMINATION: Opinions.** It is competent to ask an expert whether or not the conditions of the injured person might have resulted from the injuries and accident outlined in the hypothetical questions. It is not for him to decide whether or not they did result from the accident. But where the cause of the injury is really not controverted and the subject-matter of the question is plainly directed to the ascertainment of a fact peculiarly within the realm of expert knowledge, the expert may state whether or not the injuries received were a sufficient cause of the injured person's physical condition.

3. ————: **General Objection.** A general objection that a question propounded to an expert was incompetent, irrelevant and immaterial, is too broad and indefinite to challenge the attention of the appellate court, if the evidence was competent for any purpose.

4. ————: ————: **Not Proper Hypothetical Question.** The general objection made at the trial that a question asked an expert is "not a proper hypothetical question and is incompetent, irrelevant and immaterial," cannot on appeal be enlarged into a specific objection that the question included matters not embraced within the pleadings.

5. **NEGLIGENCE: Collision of Cars: Defective Brake: Not Pleaded.** Defendant's street car, on which plaintiff was a passenger, collided with a railroad engine at a crossing, and the petition charged that the defendant negligently failed to stop the car and to ascertain, by looking and listening, the approach of the railroad train. At the trial the defendant offered a witness who testified that the accident was due to a defective brake. *Held, first,* that it was not error to permit plaintiff on cross-examination to show that the witness was mistaken in saying the accident was the result of a defective brake; *second,* it was proper to extend that cross-examination to show, by indirection, the improbability of the brake's being out of repair in the

evening of the same day on which at noon the motorman had reported it defective; and, *third*, defendant cannot complain, since it brought forward that defense itself by introducing the witness and extracting from him the evidence of the defective brake, that plaintiff by his cross-examination had muddied the waters of justice with prejudice, in that the evidence tended to impress the jury with the idea that the defendant was knowingly using an unsafe car to the jeopardy of its passengers.

6. ――――: Speed of Trains: Ordinance as Defense: Not Pleaded. An ordinance regulating the speed of railroad trains, sought to be used by defendant street railway to show that the injury to the plaintiff passenger, caused by the collision between its car and the engine, was due to the railroad's negligent running of its train at a rapid rate, need not be pleaded, in order to be competent evidence. In such case, the ordinance is sought to be used as an evidential fact, and evidential facts should not be pleaded. [Distinguishing Givens v. Van Studdiford, 86 Mo. 149.]

7. ――――: ――――: ――――: Not Competent for Any Purpose. But the ordinance, in such case, is not competent for any purpose, if the motorman did not rely on the presumption that the railroad train would observe it, but, on the contrary, saw it in time to have avoided the collision, and, if he is to be believed, failed to do so because the brakes and other appliances were defective. A mere presumption may not be indulged to establish a fact, when there is actual knowledge of the non-existence of the fact.

8. ――――: Instructions: Injuries: Not Specifically Pleaded: Theory at Trial. Appellant cannot complain on appeal that the instructions concerning plaintiff's injuries pointed to the evidence in the case and not to the petition and authorized the jury to allow plaintiff for injuries received in the accident without limiting his recovery to those specified in the petition, if both sides tried the case on the theory that other injuries present but not specifically pleaded were the natural results of the concussion pleaded. And the appellate court will not undertake to say whether or not the injuries shown were the natural result of those pleaded, if they were assumed by both sides at the trial to be.

9. ――――: ――――: ――――: ――――: ――――: Change of Theory on Appeal. An appellant must lie in the bed he made for himself at the trial. Having chosen to put a certain interpretation on the pleading, he is bound by it on appeal.

10. APPELLATE PRACTICE: Instructions: Injuries Not Specifically Pleaded: Material Error. Guided by the statute which

prohibits the appellate courts from reversing a judgment unless error was committed against appellant materially affecting the merits of the action, the court will not reverse the judgment on the ground that the instructions on the point of injuries were broader than the petition, if to do so would be but to send the case back for a new trial on the facts already fully disclosed.

11. ———: ———: ———: Variance, etc. Where there was no suggestion of variance in the trial court, no affidavit filed, and proof was offered without objection that plaintiff had received injuries which were not specified in the petition, the appellate court will not approve an assignment that the proof and instructions were broader than the petition. The court in such case will not deprive respondent of his judgment on the ground of incompleteness or imperfection of his pleadings, although, under the statute, after the proof was offered, he could have amended his petition to conform to the proof, but did not do so. This is the meaning of section 676, Revised Statutes 1899.

12. ———: ———: Joint Tortfeasors: Contributing To Injury. Contributing to the injury on the part of a tortfeasor is, in the eyes of the law, the same as causing it. So that where plaintiff, a passenger on a street car, was injured by the collision of the car with a railroad engine at a crossing, and sued only the street railway company, charging that its negligence was the cause of his injuries, and the defendant tried to show that it was the negligence of the railroad in running its engine at a too rapid speed that caused the injury, it is not error to instruct the jury to find for plaintiff if the negligence of defendant contributed to the injury; that is, to find for him if the railroad train was run negligently and the street car was also run negligently, and the two acts of negligence combined to produce plaintiff's injury.

13. EXCESSIVE VERDICT: $7,500. The evidence leaves in doubt whether plaintiff's most serious injuries, which were to the sight of one eye and the hearing of one ear, are permanent, and whether they will yield to. treatment which had never been tried. Held, that a verdict for $7,500 was too large by $2,500.

14. ———: Prejudicial Irrelevant Matters. At the trial questions directed to showing that a mob was after the motorman in charge of the street car which collided with a railroad engine and that he hid out and that fact was published in the newspapers, were repeated over and over again, but always excluded by the court. Held, that these questions were not reversible error, but were prejudicial nevertheless, and are to be considered in connection with the assignment that the verdict was excessive.

Appeal from Jackson Circuit Court.—*Hon. E. P. Gates,* Judge.

AFFIRMED ON CONDITION.

*John H. Lucas* and *Chas. A. Loomis* for appellant.

(1) The court erred in the admission of incompetent evidence. (a) The evidence of Dr. J. R. Snell: Taylor v. Railroad, 185 Mo. 255; Holloway v. Kansas City, 184 Mo. 39; Allen v. Railroad, 183 Mo. 437. (b) The evidence of Rufus A. Grant: Eddy v. Baldwin, 32 Mo. 374; Kuhn v. Weil, 73 Mo. 215; Weil v. Posten, 77 Mo. 284; Lenox v. Harrison, 88 Mo. 495; Wilson v. Albert, 89 Mo. 540. (c) The evidence of W. W. McVey: Above authorities. (d) The evidence of Dr. J. H. Thompson: Taylor v. Railroad, supra; Benjamin v. Railroad, 133 Mo. 289. (2) The court erred in refusing to admit competent evidence. City ordinance: Riska v. Railroad, 184 Mo. 188; Payne v. Railroad, 129 Mo. 416; Bluedorn v. Railroad, 121 Mo. 267; Sullivan v. Railroad, 117 Mo. 214; Bluedorn v. Railroad, 108 Mo. 439; Hutchinson v. Railroad, 161 Mo. 253; Merz v. Railroad, 88 Mo. 677; Kelly v. Railroad, 95 Mo. 285; Robertson v. Railroad, 84 Mo. 121. (3) The court erred in giving instructions. (a) There is no limitation to the amount he might recover for "medical and surgical services and medicines," while the petition limits the same to $500. (b) There is no evidence of future "pain and anguish." Barr v. Kansas City, 105 Mo. 559; Brake v. Kansas City, 100 Mo. App. 615. Instruction number two: (a) Enlarges the issue by authorizing a recovery if defendant's action contributed to the injury, while the petition counts on defendant's act producing the same. Seymour v. Seymour, 67 Mo. 303; Crews v. Lackland, 67 Mo. 619; Wyatt v. Railroad, 62 Mo. 408; Donahoe v. Railroad, 83 Mo. 565; State v. Rutherford, 152 Mo. 133; State v. Hibler, 149 Mo. 486.

(b)   Contradicts the allegations of the petition, and is self-contradictory.  Seymour v. Seymour, supra; Crews v. Lackland, 67 Mo. 619; Wyatt v. Railroad, 62 Mo. 408; Donahoe v. Railroad, 83 Mo. 565.   (c)   Ignores the contentions of defendant, and omits essential elements of defense.   Railroad v. Stock Yards Co., 120 Mo. 565; Raysdon v. Trumbo, 52 Mo. 39; Chitty v. Railroad, 148 Mo. 74.   (d)   Is misleading and contradictory of instructions given for defendant.   Mead v. Brotherton, 30 Mo. 201; Sawyer v. Railroad, 37 Mo. 241; Green v. Parker, 85 Mo. 107.   (4)   Refused instruction, number 13, ought to have been given.   This simply declares that in determining the question of negligence on the part of the employees of the company, they should consider the rate of speed and violation of law on the part of the Missouri Pacific.   Riska v. Railroad, 180 Mo. 188; Gratiot v. Railroad, 116 Mo. 464; Paden v. Van Blargiven.   If the proximate cause of the injury was the com, 181 Mo. 128.   Number 14 ought to have been negligence of another, the defendant under the pleadings should go acquit.   Feary v. Railroad, 162 Mo. 96; Harrison v. Railroad, 55 L. R. A. 608; Potts v. Railroad, 33 Fed. 610; Federal Steel R. Co. v. Gibson, 96 Pa. St. 83; Quinlan v. Railroad, 4 Daly 488; Central Pass. Co. v. Kuhn, 86 Ky. 578; Railroad v. Boyer, 97 Pa. St. 91; Hite v. Railroad, 130 Mo. 138.   (5)   The verdict is excessive; such as to shock the sense of justice and right of fair-minded men.   Evans v. Trenton, 112 Mo. 405; Cook v. Railroad, 94 Mo. App. 425; Holliday v. Jackson, 21 Mo. App. 669; Ensor v. Smith, 57 Mo. App. 594; Markey v. Railroad, 185 Mo. 365; Taylor v. Railroad, 185 Mo. 262; Nicholds v. Plate Glass Co., 126 Mo. 67; Rice, Stix & Co. v. Sally, 176 Mo. 148.

*Scarritt, Griffith & Jones* for respondent.

(1)   There is no merit in the appellant's objections to the hypothetical questions propounded to Drs. Snell

and Thompson. The sole specific objection relied upon is that the subject of the inquiry is not a matter of expert knowledge. Taylor v. Railroad, 185 Mo. 256; Redmon v. Railroad, 185 Mo. 1; O'Neil v. Kansas City, 178 Mo. 91; Robinson v. Railroad, 103 Mo. App. 112; 1 Wigmore on Evidence, sec. 673. (2) There was no error on the part of the trial court in refusing to admit the alleged speed ordinance of Kansas City. (a) This was objected to among other reasons, as incompetent. The paper offered in evidence did not purport to be under the seal of the city, nor to have been printed or published by authority of the city. It was therefore incompetent. Art. 3, sec. 12, Kansas City charter; R. S. 1899, sec. 3100. (b) It was irrelevant to any issue in the case. This alleged ordinance was the last tender in evidence of the defendant. No such ordinance had been pleaded. It did not and could not apply to the conduct of either the plaintiff or the defendant. The answer, in so far as it applies to the Missouri Pacific Railway Company, charges that the negligence of that company in operating its railroad train was the sole cause of the plaintiff's injuries. Givens v. Van Studdiford, 86 Mo. 159; Brash v. St. Louis, 161 Mo. 437; Payne v. Railroad, 128 Mo. 419. But the fact, as disclosed by this record, is that the motorman did not presume nor assume any such thing. Neither defendant's motorman nor defendant's counsel anywhere in the record pretend that the motorman was misled, or overtaken, because he believed that the Missouri Pacific train was running but six miles an hour, when in fact it was running at a greater rate of speed. Graney v. Railroad, 157 Mo. 666; Fox v. Railroad, 85 Mo. 679. That a presumption as to a fact cannot be indulged by a person who has knowledge to the contrary has been repeatedly held in this State. Nixon v. Railroad, 141 Mo. 425; Lynch v. Railroad, 112 Mo. 420; Payne v. Railroad, 129 Mo. 420; Weller v. Railroad, 120 Mo. 651; Reno v. Railroad, 180 Mo. 469. (3) The objections of appellant

to ·plaintiff's instruction 1 are hypercritical and without merit. It is claimed that the instruction did not limit the recoverable damages to the injury specified in the petition. The language of the instruction limits the recovery to the injuries disclosed by the evidence. Wilbur v. Railroad, 110 Mo. App. 689; Brown v. Railroad, 99 Mo. 318; Seckinger v. Mfg. Co., 129 Mo. 590; Coontz v. Railroad, 115 Mo. 674; State ex rel. v. Bacon, 24 Mo. App. 405; Pinney v. Berry, 61 Mo. 359; Barrett v. Telegraph Co., 42 Mo. App. 542. This record does not show any objection or exception to any offer of evidence tending to show the extent or nature of plaintiff's injuries on the ground that such injury was without the scope of the allegations of the petition. Smith v. Fordyce (Mo.), 88 S. W. 680; West v. Railroad, 187 Mo. 351. (4) The evidence set out by appellant in its brief to show that the verdict is excessive is garbled and unfair. In the light of the evidence it seems to us the claim that the verdict is excessive is absurd. O'Neill v. Kansas City, 178 Mo. 91; Smith v. Fordyce, 88 S. W. 679; Drake v. Kansas City, 88 S. W. 690; Henderson v. Kansas City, 177 Mo. 477.

LAMM, J.—This is a suit for damages based on the alleged negligence of the defendant, an electric railway company engaged in conveying passengers for hire in Kansas City, Missouri, on its own cars and operated by its own employees. The verdict was for $7,500 and defendant, perfecting its appeal, brings the case here for review.

Omitting *pro forma* allegations and matter by way of inducement, as well as descriptive of the injuries sustained by plaintiff, and directing our attention to the negligence pleaded, the petition is as follows:

"That while plaintiff was on said car as a passenger and while said car was proceeding north on and along said Montgall avenue at the place where said tracks of

said defendant cross the said tracks of the Missouri Pacific Railway Company within the corporate limits of said Kansas City, the servants and agents in charge of said car carelessly and negligently ran the same on and upon the tracks of the said Missouri Pacific Railway Company in front of and against an engine and train of cars which were running on said tracks of the Missouri Pacific Railway Company in a westerly direction, at a rapid rate of speed, thereby causing the injuries to plaintiff hereinafter complained of; that before attempting to cross said railroad tracks of the Missouri Pacific Railway Company as aforesaid, the defendant, by and through its servants and agents in charge of said car, negligently failed and neglected to stop said street car upon which plaintiff was riding as a passenger as aforesaid and so failed and neglected to ascertain the approach of said railroad train by looking or listening for the same before attempting to cross said tracks; and so failed to have or provide any watchman or other means of warning of the approach of said train at said crossing; that the said collision so occasioned by the negligence of the defendant as aforesaid was of great force and violence, throwing said street car wherein plaintiff was riding as a passenger as aforesaid from the tracks whereon it was being propelled, thereby,'' etc.

The last specification of negligence, whereby liability is predicated of a failure ''to provide any watchman or other means of warning of the approach of said train at said crossing,'' was taken from the jury by instruction and thus becomes by-matter in the case.

It will be seen that the pleader does not rely upon a general averment of negligence, and, furthermore, that the negligence pleaded is limited to running and operating the car and that the specifications do not cover or include a defective or unsafe car, or defective or unsafe mechanical equipment in use thereon. And this distinction should be borne in mind, *passim,* as perti-

nent to some of the questions hereinafter to be considered.

To this complaint defendant interposed a general denial, followed by special matter, viz:

"And for further answer defendant says that whatever injuries plaintiff sustained, if any, were solely caused by the negligence and carelessness of the Missouri Pacific Railway Company, in carelessly and negligently running its train over, upon and against the car of defendant and in running its said train at a careless, negligent and unlawful rate of speed and in carelessly and negligently failing to ring its bell or sound its whistle while its train was approaching the crossing of this defendant's tracks, and in carelessly and negligently failing to give any notice or warning of the approach of its said train to the tracks of defendant where the injury occurred. Wherefore defendant prays to be dismissed with its costs."

Montgall avenue is a north-and-south street in Kansas City and crosses the Missouri Pacific railroad at right angles. Two tracks of appellant company are laid in this street, the east of which concerns us. The right of way of the Missouri Pacific Railway Company is one hundred feet wide with a single track laid in the center, upon which incoming west-bound trains alone run. Approaching from the south, the street railway crosses the railroad track on grade, and, for a distance south, the surface of the earth is level. Fronting Montgall avenue for one hundred feet on the east side, south of the railroad right of way, and flush with the south line of said right of way, is a building two stories high devoted to "bottling" purposes, and which building obscures the view eastwardly on the Missouri Pacific track to anyone on said avenue close to and south of said right of way. But, the right of way once reached, there was a clear view to the east for a considerable distance, and this condition continued for fifty feet in approaching and crossing the Missouri Pacific track.

There had been a thaw, the snow had melted, and the melting snow had bred slush and mud, the air was somewhat thickened with fog, and darkness had fallen, when, at the close of December 23, 1901, a locomotive, equipped with a going electric headlight and pulling a Missouri Pacific passenger train, running west, violently collided with one of appellant's street cars, running north on Montgall avenue, on which respondent, returning from his day's work, was riding as a pay passenger, smashing the front or vestibule of the street car, knocking the car off the track and whirling its north end westward, so that the car paralleled the railroad track —the locomotive pilot being likewise damaged by the collision.

Respondent was seated towards the front of the car, on the west side facing east, when the impact came, was picked out of the debris unconscious, bleeding from incised wounds and contusions on the head, and suffered other injuries, appearing more fully in the course of this opinion in connection with a consideration of the amount of damages.

There was evidence tending to show that the street car ran into the locomotive and, *contra,* evidence tending to show that the locomotive ran into the street car; likewise evidence tending to show that the car just as it approached the crossing had been slowed down to a rate, say, of six miles per hour, and was going at that rate at the time of the accident, and countervailing proof to the effect that it had come to a dead stop on the track at the instant of the collision. There was proof offered by appellant that the car had been inspected the same day and was in good condition, and other proof, also offered by appellant, to the effect that the car became unmanageable, that the brake would not work, that the "automatic popped off," and tending to show that the accident was unavoidable. There was evidence tending to show that the passenger train was running at a rate of twenty-five to thirty miles per hour and was giving

no signals by bell or whistle of its approach to the crossing, and, *contra,* there was evidence tending to show that signals of its approach were given. So, too, there was evidence tending to show that a car properly equipped and going at the speed of this car, could have been stopped in fifteen feet, the details of which, with other facts established by the proof and necessary to an understanding of the case and the several assignments of error, will appear in this opinion in connection with a consideration of those assignments, *seriatim.*

Holding the laboring oar in seeking to disturb the verdict by showing it to be the product of reversible error, appellant presents here under five general headings its insistences in that behalf, which may be formulated, thus:

1. That the court erred in the admission of incompetent evidence.

2. And in refusing to admit competent evidence.

3. And in giving instructions.

4. And in refusing instructions.

5. And lastly, appellant says, the verdict is excessive.

Of these in their order.

I. Under the claim of incompetent evidence, it is insisted it was error to allow the following question propounded by respondent's counsel to, and answered in the affirmative by, Dr. Snell, a medical expert of pronounced ability, who had examined respondent and testified to having discovered in June or July following the accident, and in later examinations, deafness of his left ear, impaired eyesight of his left eye, tenderness at the junction of the cervical and dorsal vertebrae of the spinal column and extreme nervousness, viz.:

"Q. Now, doctor, if it is developed by the evidence here that on the evening of December 23rd last this man, who had been a constant laborer, working daily prior to that time for years, was seated in a street car, an electric car, and a collision occurred between that car and a

train of the Missouri Pacific when the street car was
going six miles an hour; this man was seated sidewise
to the direction the car was going, near the front of the
car, and that the whole of the front of the car was
smashed in—demolished—and immediately after this
man was found on the floor near the front of the car
with bruises on his head, indicating contact with a hard
substance on the top of his head and his scalp opened
from the outside corner of the left eye back in a diag-
onal direction across the forehead toward the right ear,
making a wound about eight inches long thrown back,
some three or four inches; in your opinion were the in-
juries so received a sufficient cause and explanation for
the condition of this man's body and the facts you have
described?''

The specific objection lodged below being that the
question was ''incompetent and not a matter of expert
knowledge,'' we are relieved by appellant from the bur-
den of examining the question from the standpoint of
its not being predicated upon established facts, in that,
it assumed facts not in proof, or that it was leading, or
otherwise vicious, for no such objections were lodged
below and hence may not be considered here.    See,
O'Neill v. Kansas City, 178 Mo. 1. c. 100, where VALLI-
ANT, J., speaking to the point, says for this court:
''When an objection is made to a question propounded
to a witness, it should be sufficiently specific to inform
the court and the opposing counsel of the real point in
the objection.    In this respect there is no difference be-
tween an objection made to a hypothetical question and
one made to any other question.    [Rogers on Expert
Testimony (2 Ed.), p. 67; Stearns v. Field, 90 N. Y.
640.]''    See, also, Railroad v. Falvey, 104 Ind. 1. c. 415.

It has become a trite common-place of the rules of
appellate procedure that a general objection, in a case
where the evidence is competent for any purpose, may
not be laid in the record below (to use a homely simile)
as an egg to hatch later in the appellate court into precise

and definite objections—objections the point to which
was concealed from the trial court and from opposing
counsel and first came out of ambush and into sunlight
in briefs to this court. Judged of by this standard, the
objection of incompetency directed to the question, may
be passed by as of no value.

The remaining objection lodged below, as said, is
that the question was not directed to a matter or subject
of expert knowledge. And at the very first blush it
is apparent the objection was not well made. The sub-
ject-matter of the question is plainly directed to the as-
certainment of a fact peculiarly within the realm of ex-
pert knowledge, to-wit, whether the conditions found by
Dr. Snell might, could or would result from the injuries
and accident outlined in the hypothetical question, and
assumed to be true.

There is a class of cases where hypothetical ques-
tions are so framed and put in civil cases as to permit
an expert to decide the very issue controverted at the
trial and presented to the jury for their arbitrament,
where opinions are not asked of experts as to whether
certain results might or would probably flow from cer-
tain given causes according to their experience and the
learning of their books, but where the very cause itself,
and that cause an obscure or doubtful one, a controver-
ted fact in issue, is sought to be got at and established
from the phenomena assumed to be true, and such ques-
tions, in some instances, under the facts of the case in
judgment, have been condemned by this court. An ex-
ample of this class of cases is Taylor v. Railroad, 185
Mo. 255. In a very late case, Glasgow v. Railroad, 191
Mo. 347, we had occasion to elaborately consider the
matter from this point of view, as well as the adjudi-
cated cases bearing thereon, and it would serve no good
end to freshly explore that field again. Suffice it to say,
that the form of the objection in hand did not direct the
lower court's mind to the contention that the expert was
asked to decide the very matter presented to the jury—

to usurp the exclusive and ancient province of the triers of fact; and, furthermore, in our opinion, if the objection was broad enough to include such contention and was leveled directly thereat, yet the question propounded to Dr. Snell is not obnoxious to such criticism in a case like this, where the whole case proceeded on both sides on the theory that the accident happened and that respondent was injured, and where, as here, the controlling defense is directed to the non-liability of appellant for that accident and that injury.

It was not error, therefore, to permit Dr. Snell to answer the question asked, and the same disposition must be made of the objection to a hypothetical question to Dr. Thompson. Dr. Thompson was appellant's witness and testified as an expert of high standing and extensive practice. Upon cross-examination this question was propounded to and answered by him in the affirmative:

"Q. Now, doctor, assuming that this man had been examined several times before, a test is made of his hearing and vision and such tests as railroad companies require and his vision and hearing had been found perfect, and on the evening of December 23, 1901, while riding in a street car that car had collided with another object in front of it on the track, and he had been thrown from his seat to the floor, and that a bruise was found on top of his head, and that his head from the corner of his eye back across diagonally through his forehead, a distance of about eight inches, had been broken through and the scalp turned back three or four inches, and he had been cut in the forehead and his teeth and mouth injured and his body bruised; would you think such an occurrence a sufficient cause for the condition of this man that you have found and described before the jury?" Appellant's counsel objected to the question as follows: "Objected to by defendant as not a proper hypothetical question and as incompetent, irrelevant and immaterial," and the objection was overruled.

Assuming from what has been already said that so much of the objection as directs the court's attention to the incompetency, irrelevancy and immateriality of the question is too broad and indefinite to challenge consideration, under the facts of this case, the only remaining contention formulated therein is that it is not "a proper hypothetical question." The reason why it is not a proper hypothetical question is in nowise pointed out in the objection. The objector might have had in mind that it was not proper because it was immaterial, irrelevant or incompetent, or for any other of a series of guessed at reasons. How could the court tell, though he possessed the astounding wisdom of King Solomon himself (the mere view of which, *inter alia,* took from the Queen of Sheba all her "spirit," 2 Chron. ch. 9, v. 3 and 4, *q. v.*), what precise objection the learned counsel had in mind? It has not hitherto been allowed to a *nisi prius* judge—a *puisne* judge—to have been so successful in

> "Mastering the lawless science of our law—
> That codeless myriad of precedent,
> That wilderness of single instances,"

that he has the whole body of the law at his fingers' ends, so to speak, for instantaneous and automatic application, *ex mero motu,* without having his attention directed by counsel to some specific legal principle or some specific fact controlled by such principle. Only appellate courts, it is modestly believed, are so endowed, and even this has been a subject of sharp discussion and possible doubt, and, peradventure, should be stated cautiously and taken *cum grano salis.*

The vice underlying any rule of practice tolerating the consideration, on appeal, of reasons and grounds not assigned in objections below, is elegantly illustrated in the case at bar; for, in appellant's brief the said general and conventional objection is swollen into the following formidable assignment of error: "This ques-

tion calls for the opinion of the ultimate fact to be found by the jury, as the one propounded to Dr. Snell did, with the additional vice that the witness is called upon without any evidence whatever of the nature of the tests, 'as railroad companies require,' and without any allegation in the petition of any impairment of his 'hearing,' or evidence 'that his head from the corner of his eye back across diagonally through his forehead, a distance of about eight inches, had been broken through,' and well might defendant's counsel contend that it was 'not a proper hypothetical question and as incompetent, irrevelant and immaterial.' ''

So that, we have presented to us an insistence, and a serious one at that, not presented to the trial judge at all, to-wit, that the hypothetical question was not only not bottomed on the testimony, but that it was outside the paper issues. If this contention be true and the trial judge's attention had been directed to the matter struck at, undoubtedly he would have sustained the objection and the question would have been so reframed by counsel as to avoid the criticism. Trial courts may not thus be convicted of error, and the point in hand comes well within the doctrine announced in O'Neill v. Kansas City, and must be ruled against appellant. [Williams v. Dittenhoefer, 188 Mo. l. c. 141-2.]

Appellant placed upon the stand its motorman, Grant, who had charge of the car in which respondent was riding. In accounting for the accident he admitted seeing the headlight of the engine and becoming apprised of the presence of danger and the necessity of stopping the car. He says, too, there was time and space to stop his car after the impending danger was known to him, and he places his inability to stop the car chiefly upon the fact that the brake would not work—that it was in some unexplained way out of condition. Going back to the allegations in the petition and recalling the fact that the petition does not charge the defendant with having a defective car or using one operated with de-

fective equipments, it will be seen that if the cause of the accident was a defective brake, then it was shown to be the result of a character of negligence not pleaded in the petition and, hence, appellant would escape liability as the pleadings stood without amendment. It follows, we think, that respondent, in this delicate crisis in his case, was not bound by the explanation of the motorman. Otherwise his case fell to the ground at once. But was entitled to fully cross-examine him on his explanation and show, if he could, that it was without substance or foundation, i. e., that the brake was in condition. In seeking to so cross-examine the motorman, respondent's counsel asked him sundry questions relating to the condition of the brake and certain statements of the motorman. These questions were objected to in some instances on the ground that they were outside the issues in the case—were directed to a character of negligence not pleaded in the petition, and the objections were disallowed. The only questions which approach the danger line are shown by the following excerpt from the record:

"Q. Why didn't they work? A. Well, I couldn't say why they didn't work; they just didn't work; they wouldn't hold the car, that is all.

"Q. You were in charge of the car, wasn't you? A. Yes, sir.

"Q. And haven't you told your people before why they did not work; the people you were working for?

"Mr. Loomis: I object to that as incompetent, irrelevant, immaterial, and not sustained by any allegations of this petition.

"Objection overruled by the court; to which action and ruling of the court the defendant at the time duly excepted.

"A. Yes.

"Q. You say you had? A. Yes, sir.

"Q. When did you tell them about it?

"Objected to by defendant's counsel. No ruling.

"A. At noon that day.

"Q. What did you tell them was the matter with that?

"Objected to by defendant's counsel as incompetent, irrelevant and immaterial. Objection overruled by the court; to which ruling and action of the court the defendant at the time duly excepted.

"Q. What did you say was the matter with them?

"Objected to by defendant on same grounds last stated. Objections overruled by the court; to which ruling and action of the court the defendant at the time duly excepted.

"A. I told them I couldn't hold the car with the brakes.

"But you went on using it? A. No, sir; I did not.

"Q. And it was in the same condition at night, you found out afterwards, it was before? A. I couldn't do a—I couldn't hold it with the brakes; I suppose the brakes was in the same condition as they was— . . ."

Disconnected from the context, it would seem respondent was not leveling this line of inquiry at showing that the motorman was mistaken in saying that the accident occurred because the brake was out of order, but was directing the questions to the very proof of the truth of the motorman's contention, to-wit, that there was a defective brake and the company's officers had notice of it. But, from a close reading of the record, we are satisfied that the object and tendency of the cross-examination were to show, by indirection at least, the improbability of the brake's being out of order in the evening when the motorman had reported it out of order at noon and an opportunity had thereby been afforded to remedy any defect—the presumption being that appellant company would instantly remedy a known defective brake in a car used for the carriage of passengers in a town whose topography or surface grades are as pronounced and picturesque as those of

Kansas City (of which we take judicial notice) and where a sound brake is a *sine qua non.*

Again: the only sting in the evidence was that it might tend to show that appellant was knowingly using an unsafe car to the jeopardy of its passengers, when such a case, bottomed on such fact, was not on trial, thereby muddying the waters of justice with prejudice. But it must be remembered (if this view be indulged) that appellant took the initiative (and the chances) by springing this very notion itself, through its witness, Grant, and whatever invitation the jury might thereby receive to go afield in deciding the case was thus invoked by appellant, and respondent's pursuing the same line of investigation could add no additional injury. The mischief, if any, was afoot—was a *fait accompli.*

Furthermore, appellant practically took the question of a defective brake out of the case by introducing uncontradicted evidence showing that the car was inspected at noon, repaired by inserting a lost bolt, and then found in perfect condition in all its equipments, and by further introducing evidence from one of its employees, who had run the car that afternoon up to 5:30 p. m., the time Grant took it, that the car was in good condition and the brake worked properly and would stop the car, and it is shown also that two hundred feet from where the accident occurred on the very trip in question, the car had been brought, presumably by its brake, to a standstill at the crossing where it left Guinotte avenue and turned into Montgall.

Constrained by the foregoing views, we hold there was no reversible error in the rulings below, and, the other specifications in this behalf being without persuasive merit, the general assignment of error under consideration is disallowed.

II. Under a claim of error in the exclusion of testimony, one contention only is presented here, viz., appellant offered and the court excluded section 895,

chap. 15, of the Revised Ordinances of Kansas City, reading as follows:

"STEAM RAILROADS.

"Sec. 895. *Rate of Speed.*—Any conductor, engineer, fireman, brakeman or other person who shall move, or cause or allow to be moved, any locomotive, tender or car over or across any public street at grade within the city limits, at a greater rate of speed than six miles per hour, shall be guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty-five dollars nor more than five hundred dollars for each and every such offense."

The objections made by respondent were that the ordinance had been repealed, had not been pleaded and was incompetent. There is no evidence before us that the ordinance had been repealed and, if otherwise competent, that objection would furnish, if adopted by the court, no reason for its exclusion. Should it be excluded because not pleaded? We think not. Where a suit is based on an ordinance it should be pleaded, because courts will not take judicial cognizance of a municipal ordinance, but where the ordinance is merely sought to be introduced as an evidential fact, it would seem, on principle, that it need not be pleaded. And this is so, because it is necessary to plead only the ultimate and substantive facts necessary to constitute the cause of action (R. S. 1899, sec. 610), it being a hornbook principle that the pleading of mere evidential facts is bad, and this rule would seem to cover ordinances as well as other evidence, and apply to answers as well as petitions. [Bailey v. Kansas City, 189 Mo. l. c. 514; Robertson v. Railroad, 84 Mo. l. c. 121; Danker v. Goodwin Mfg. Co., 102 Mo. App. l. c. 731.]

We are cited by respondent to the case of Givens v. Van Studdiford, 86 Mo. 149, as holding a contrary view. But the case does not so decide. The point was made in that case, which was a suit for damages for leasing a

bawdy-house, that a certain social-evil ordinance, regulating such houses and not pleaded in the answer, was improperly excluded. But it was ruled that the ordinance should have been admitted under the facts in judgment. However, in formulating a general principle, the court said: "Where a party asserts and founds a right to recover upon a city ordinance, he should plead the ordinance, and where a party seeks to justify an act done by him under an ordinance, it would seem he should also plead the ordinance. . . . But we do not see that these principles apply to this case." This general proposition is sustained by Mooney v. Kennett, 19 Mo. 551. It will be noted, however, that the rule goes no further than that "where a party seeks to justify an act done by him, under an ordinance," he should plead the ordinance. In the case at bar it will be readily seen that the defendant does not confess and avoid. It does not admit an act and seek to justify it. On the contrary, it denies the act laid at its door and says another party did it; so that, it can not be held that Givens v. Van Studdiford, supra, lays down a rule governing pleading in an answer, controlling such a case as this. The gist of the answer is that defendant does not admit the act and seek to justify under an ordinance, but it merely undertakes to show the negligent act of a third party as an incident in the case and as the sole cause of the accident, the *causa causans*, and, as a foundation to build such contention upon, it sought to introduce a city ordinance controlling the rate of speed of steam railways. Coming into the case in this incidental way and not as a constitutive element in a cause of action, nor by way of justification in an answer of an admitted act, no reason is perceived why it is necessary to plead the ordinance any more than other evidence tending to show complete non-liability by proof that the accident was caused by a third party. And we accordingly so hold.

Indeed, it may well be doubted whether it was

necessary for appellant to have pleaded, as it did, the acts of the Missouri Pacific Railway Company in order to have the benefit of such acts as a defense; for under a general denial any fact which goes to show the facts, constituting the cause of action set forth in the petition, are not true, may be proved. It is only where a defense is made in the nature of a confession and avoidance that affirmative matter must be set forth, and it would seem that, if A sues B for striking and injuring him, B, under a general denial, might show that C struck the blow, and such proof would be some evidence that B did not. [Jones v. Rush, 156 Mo. 364; 5 Ency. of Pl. and Pr., 717; Young v. Kansas City, 27 Mo. App. l. c. 118, et seq., and cases cited.] But this view is somewhat *obiter*.

From remarks preserved in the record it would seem that the court did not exclude the ordinance for reasons assigned in respondent's objection, but for the reason that the charter of the Missouri Pacific Railway Company exempted it from municipal speed regulation. It may be said on this score that if such charter exemption existed based on any organic law, counsel for respondent have not put their finger on such exemption and pointed it out. We may safely assume, therefore, that such exemption does not exist.

If then, the ordinance was competent for any purpose, its exclusion must be held error. Was it competent for any purpose? We think not. Its admissibility is urged upon the principle that appellant's motorman had the right to regulate his movements upon the theory that the Missouri Pacific Railway Company was running its trains in obedience to the mandate of the ordinance. In many cases this court has asserted the general proposition that one may safely act upon the presumption that operatives of street cars and steam cars are obeying proper and reasonable speed regulations, but the doctrine is subject to a qualification and that qualification is that no such presumption can be in-

dulged, or acted upon, where it is seen and known that such cars, in a given case, are proceednig in violation of the regulation. In such case the legal purpose to be conserved by the presumption does not exist. The whole doctrine is guardedly stated in Hutchinson v. Railroad, 161 Mo. 1. c. 254, thus: ''The city ordinance prohibited the train running at a higher rate than six miles an hour, *and in the absence of proof that she knew or had reason to apprehend to the contrary,* the law will presume that she trusted, as she had a right to trust, that the defendant was running its train at not more than six miles an hour in obedience to the ordinance, and that she regulated her movements accordingly. This court has frequently so declared the law.''

In applying the general proposition, as modified above, to the facts of this case, our first inquiry must be, What are the facts? The only eyewitness placed upon the stand by appellant, personally conversant with these facts, was Grant, the motorman. The conductor was badly hurt and did not testify. In substance Grant says the Missouri Pacific train was running twenty-five or thirty miles an hour. He saw and apprehended that fact. He says, too, that as he approached the crossing he saw the headlight of the locomotive a quarter of a mile or more away and could not tell at first whether it was moving or not; that he slowed his car down to a rate ''slower than a man could walk'' as he approached the crossing; that he then became aware of the presence of the danger and apprehended the necessity of stopping the car. Because of this and from other facts testified to by him, he undertook to stop the car. He had full time and space to stop it in, after he knew all these things, but the brake refused to work, he says, and the car would not stop. Still under the pressure of the emergency, he used the reverse lever, whereupon the ''automatic popped off'' and the circuit was broken. Whereat he undertook to ''regenerate'' (whatever that

may mean), but all failed him; the car proceeded onto
the track, came to a standstill and the crash followed in
the twinkling of an eye. Now, if this car had been pro-
ceeding to the track and the motorman had seen
through the fog, as through a glass darkly, the head-
light of the approaching locomotive at a safe distance,
and, relying on the speed ordinance, went his way, then
a different case might be presented and the doctrine
invoked by appellant might find place. But, under the
showing made here, presumptions are eliminated, they
become mere barren idealities, and there is no room for
their indulgence, nor does the motorman claim he in-
dulged any. On the other hand, whether the train was
going swift or slow, this motorman placed himself in
the situation of knowing the deadly peril menacing his
passengers. So knowing, he tried, he says, by every
means in his power to avert their impending doom by
stopping his car. Whether he did use a high degree of
diligence, or not, was for the jury to say. He had
ample time to stop the car if the equipment was perfect
and he used such diligence. If the equipment was im-
perfect, then under the pleadings, in the absence of
amendment, appellant escapes liability, and whether it
was imperfect or not was for the jury to say under the
controverted facts.

That a mere presumption may not be indulged to
establish a fact when there is actual knowledge of the
non-existence of the fact, is an uncontrovertible propo-
sition. [Reno v. Railroad, 180 Mo. l. c. 483; Nixon v.
Railroad, 141 Mo. l. c. 439.]

The ordinance, therefore, was not competent for
any purpose, and, so holding, this assignment or error
is ruled against appellant.

III. Respondent was given two instructions and
error is assigned of the giving of both. The first tells
the jury, among other things, that they should assess
plaintiff's damages at such sum ''as you believe from
the evidence will compensate him for the injuries, if

any, received by reason of the acts and conduct of the defendant referred to in other instructions.'' Respondent concedes that ''this language limits the recovery to the injuries disclosed by the evidence.'' In other words, respondent admits the instruction points the jury to the evidence for the ''injuries'' rather than to the allegations of the petition. The eleventh instruction given for appellant tells the jury that they were not allowed to enter the field of conjecture, speculation, possibility or probability in estimating the damages. That they could not in any event find for the plaintiff any damages except those that plaintiff had affirmatively proven by the preponderance of the testimony he had actually sustained and which were the direct and proximate effect of ''or produced by the injuries complained of.''

In elaborating the contention of appellant about to be considered, it will be necessary to refer to the petition and to the events of the trial for an understanding thereof. The petition alleges with particularity the injuries received. They were a violent concussion of the head, cuts, bruises, wounds and injuries to the scalp and periosteum of the skull, injuries to the eyes and eyesight, the glands, muscles and tissues of the neck behind and under both ears, headaches and bodily pain and anguish of mind, injuries to the back and kidneys, legs and knees. The petition says nothing about impairment of the auditory nerve nor of the nervous system generally, nor of emaciation or lost flesh. At the trial a mass of evidence was introduced showing emaciation, a nervous condition as a result of the injuries and an inert or impaired auditory nerve whereby partial deafness had resulted in the left ear. All this evidence was introduced on both sides without protest or exception. For instance, one expert used as a witness of defendant was permitted to examine the plaintiff with reference to impaired hearing and testified that his hearing in his left ear was impaired and that

such condition was what was called "nervous deafness which very frequently happens after injuries to the head."

In this condition of the record, appellant insists that said instruction "authorized the jury to allow plaintiff such damages as will compensate him for injuries received in the collision without limiting the recovery to those specified in the petition." Is there merit in the contention that this was error? We think not. Because the case was tried on the theory on both sides that emaciation, the deafness in the left ear, the lost flesh and the nervous condition were the natural results of a violent concussion and shock about the head, the center of the nervous system, and it is elementary law that a necessary and natural result of an injury pleaded may be offered in evidence, without such result being specifically pleaded.

Whether the aforesaid facts, if viewed with sour nicety, would be irresistibly considered the natural and necessary result of a violent concussion of the head, need not be considered by us, because they were so treated by the learned counsel who tried the case, and surely this court may be allowed the same grace of liberality in their consideration that counsel assumed below. Having chosen to put that interpretation on the pleading, appellant is bound thereby and estopped to vary or gainsay such theory on review. It must lie in the bed it made.

Again: in appellant's eleventh instruction the fact that the damages were limited to those "caused or produced by the injuries complained of," obtrudes itself. This quoted phrase is logically susceptible of two meanings. One meaning might be, complained of in the *petition*. Another meaning might be, complained of in the *evidence*. Either meaning impairs the force of the present assignment of error, because, if it meant that the jury should look into the evidence for the "injuries complained of," it thereby adopted the theory of re-

spondent's instruction, and the error, if error it be, was thereby waived. If, on the other hand, the instruction meant to limit the jury to the injuries complained of in the petition, then, as all the instructions are to be read together as one body of law applicable to the facts of the case, the mere loose generality of the language used in respondent's instruction may be considered limited and controlled and whittled into precision by defendant's instruction, and the error, if any, is cured, and whether waived or cured, amounts to the same thing as no error at all.

Furthermore, inasmuch as we are prohibited by the mandate of the statute (R. S. 1899, sec. 865) from reversing a judgment unless we shall believe that error was committed against appellant materially affecting the merits of the action, some force must be given to this legislative rule, and the case at bar, on the question now in hand, seems to fall within its spirit. Because, all the facts pertaining to said results of repondent's injuries were fully gone into by both parties and uncovered below. And by putting their own construction on the petition, its scope may have been somewhat broadened and was so treated. The court below would have been constrained, on offer, to have allowed an amendment, if deemed necessary (and such necessity we do not decide) to make the petition conform to the proof. In this condition of things, to reverse this case on this point would be but to send it back for a new trial on the same facts fully disclosed, and would serve no judicial purpose. [Wise v. Railroad, 85 Mo. 178.]

Section 676, Revised Statutes 1899, reads as follows: ''It shall be the duty of the courts to so construe the provisions of law relating to pleading, and to so adapt the practice thereunder as to discourage, as far as possible, negligence and deceit, to prevent delay, to secure parties from being misled, to place the party not in fault as nearly as possible in the same condition he would be if no mistake had been made, to distinguish

between form and substance, and to afford known, fixed and certain requisitions in place of the discretion of the court or judge thereof.'' In a case in which a some-what similar contention was made, this court, applying the foregoing section of the statute (Mellor v. Railroad, 105 Mo. 1. c. 470), said: ''Can anyone read these provisions of our code without being irresistibly driven to the conclusion that it was the purpose of the Legislature, as it should be the purpose of every enlightened system of jurisprudence, that one square, open and fair contest should end the litigation in a given case?''

Then, too, there was no suggestion of variance below, no affidavit filed, and, as said, the proof was admitted without objection. In this condition of things the Supreme Court of the United States adopted the language of Tyng v. Commercial Warehouse Co., 58 N. Y. 1. c. 313, thus: ''It would, therefore, be highly unjust, as well as unsupported by authority, to shut out from consideration the case, as proved, by reason of defects in the statements of the complaint. Indeed, it is difficult to conceive of a case in which, after a trial and decision of the controversy, as appearing on the proofs, when no question has been made during the trial in respect to their relevancy under the pleadings, it would be the duty of a court, or within its rightful authority, to deprive the party of his recovery on the ground of incompleteness or imperfection of the pleadings.'' [Wasatch Mining Co. v. Crescent Mining Co., 148 U. S. 293. See, also, Chouquette v. Railroad, 152 Mo. 257; Fisher Real Estate Co. v. Realty Co., 159 Mo. 562; Railroad v. Moore, 37 Mo. 1. c. 341; Grayson v. Lynch, 163 U. S. 468; Leeper v. Paschal, 70 Mo. App. 117; Friermuth v. McKee, 86 Mo. App. 64; Price v. Hallett, 138 Mo. 561, 574, et seq.]

Other objections are directed at instruction numbered 1, but we deem them not fatal. For instance, the instruction allowed plaintiff to recover for future pain and anguish, and it is contended there is no evidence

in the record to sustain that element of damage. We do not so read the record, and, avoiding further details, disallow the assignment of error based on the giving of that instruction.

Instruction numbered 2 given for plaintiff is too long to copy here. Appellant's criticisms of it are pleasing illustrations of linguistic dialectics and refinements of grammatical construction, but, in our opinion, they do not impair the validity or usefulness of the instruction as a just rule for the guidance of ordinary, hard-headed men in a box. It would spin out this opinion beyond fair bounds to consider all the criticisms leveled at instruction numbered 2, one at a time, but there is one that challenges some consideration. The instruction allowed the jury to find for the plaintiff if the acts and conduct of the defendant, therein specifically set forth, *contributed* to the injury. That is to say, if the Missouri Pacific train was run negligently, yet if appellant was also negligent and the two series of negligences, one flowing from appellant and the other from the Missouri Pacific Railway Company, united in causing the injuries, then plaintiff could recover. The contention is that the petition counts on the theory that the defendant *caused* the injuries; that having adopted that theory, it is not permissible for plaintiff to recover on the theory that the cause was a joint product of two tortfeasors instead of the sole product of one.

The rule is fundamental that if A and B contribute to injure C, C may sue both or either and recover. [21 Am. and Eng. Ency. Law. (2 Ed.), 496.] See also, the authorities considered and applied, *arguendo,* by this court in Newcomb v. Railroad, 169 Mo. 409, and in Brash v. St. Louis, 161 Mo. 433.

In this class of cases, contributing to the injury on the part of a tortfeasor is, in the eye of the law, precisely the same as causing it. No gradation is tolerated. To say that A and B contributed to the injury of C is one

and the same thing as saying that A caused the injury and B did, too. The instruction struck at put it to the jury both ways and was well enough.

The other criticisms of instruction numbered 2 have been examined and are considered groundless. It results from these views that the whole assignment of error predicated on the giving of instructions must be disallowed.

IV. Nor was there error in the refusal of instructions. Appellant asked and received twelve instructions which put every pertinent defense to the jury, in some instances in a more favorable way than allowable. The instructions refused were either incompetent declarations of law, under the facts of the case, or were covered by those given. The assignment of error in this behalf is, therefore, overruled.

V. It is next assigned for error that the verdict is excessive. The evidence shows that respondent was a day laborer of sense and sensibility, earning $40 per month; was thirty-seven years of age; was in good health before the accident and weighed from 148 to 150 pounds; that at the time of the trial, in the October following the accident, his weight was 132 pounds; that he was troubled with headaches; that up to the time of his injury he had been engaged in the heavy work of handling agricultural implements for a transfer company; that he was laid up in the neighborhood of two months as the result of his injuries; that he was under a physician's care from thirty to forty days, or, as estimated by one witness, well on to three months; that on returning to his former occupation he was unable to do the heavy lifting incident thereto and left his employment; that his back was weak; that his kidneys were disordered; that he suffered pain in the neck and otherwise at times; that the sight of his left eye was impaired; that he was extremely nervous; that his hearing in his left

ear was dulled; that he bore pronounced scars on his forehead, and was emaciated.

Dr. James Middleton, the attending physician, testified that a suppurating contused wound was on the top of respondent's head, that for some time he could not lie down; that his reasonable charge for his services was $158; that he made no examination of his eyes; that his eyesight seemed to be "progressing worse," and that it would probably continue so to do; that the injury to the eye was referable to a brain injury; and gave other evidence tending to show there was a disorder of the kidneys, for which he gave respondent palliative medicine during the time he was his attending physician; that the treatment given was to sew up the incised scalp wounds and cleanse them; that in about three months the main one was healed entirely. Referring to these wounds, the following occurred on cross-examination:

"Q. Now, you treated this man until you considered him fully recovered? Practically so? A. Yes, sir.

"Q. And when you discharged the patient and ceased to treat him further, in you judgment no further treatment was necessary for that wound, was it? A. Not for that wound, no, sir."

He further testified that the wound on the forehead was a flesh wound and healed in two weeks and was cured; and that one or two teeth were loose but this trouble ceased in a week. This physician did not treat respondent for his eyes; he was not an oculist and it was not in his line. He observed no wounds or bruises upon his body near or touching his kidneys; that he was not a kidney specialist. He further testified that his emaciation was a "possible" result of injuries to the brain.

Dr. Snell was examined on behalf of respondent. Respondent was never his patient. He merely examined him as an expert and for the purposes of testifying.

He found several subjective symptoms, such as a numbness where his head had been injured, tenderness in certain parts, emaciation of body and a defect in his sight and hearing. This examination was in June or July, 1902, six months or so after the injury. He examined respondent again two or three weeks before the trial, found no change in sight or hearing, found less tenderness about the spinal column and less tenderness about the base of the brain, but more in the small of the back, and that his emaciation had improved. The following occurred as shown from the record:

"Q. Now, from the statement of the case involved in that question, and from the conditions that you have described to the jury in your testimony, as you found them, give the jury, if you please, your opinion, as to the permanency of these injuries? A. Well, as regards the eyesight, in my judgment, it will not get any better; as regards the hearing, I don't think that will improve any; as regards the other condition—

"Q. Take this condition of emaciation, kidney trouble, and so on? A. Well, now, I can't tell anything about his kidneys; I did not examine his water so as to tell and I can't tell anything about the kidneys unless I do examine the water, therefore, I would rather not testify in regard to the kidneys."

On cross-examination of Dr. Snell the following occurred:

"Q. You did not examine the patient, doctor, with a view of treating him at all? A. No, sir, I examined him at the request of Mr. Scarritt there, as he told you.

"Q. Now, with reference to his hearing, what examination did you make in that regard, specially? A. Well, I gave him the ordinary test that we give all patients; I took my ear speculum and examined the internal ear as far as could be seen and then I tested his ability to hear the ticking of my watch."

He further testified that the hearing capacity of his left ear was impaired sixty per cent, but that re-

spondent, by use of both ears, could hear ordinary con-
versation at ordinary distance without any trouble;
that respondent could read fairly well with his right
eye; but with the left eye the reading matter had to
be held very close. And then the following occurred:

"Q. I believe you said you didn't examine him for
the purpose of treatment? A. No, sir, I did not.

"Q. Simply to ascertain his condition as far as you
could? A. Yes.

"Q. You make a specialty of the eyes or ear? A.
No, sir.

"By Mr. Scarritt:

"Q. You are a general practitioner? A. Yes.

"Q. In all these departments? A. Yes, sir.

"Q. Is it your opinion, too, the only thing to do
for this man is to put him under a specialist of the eye
and ear and kidneys and have him treated in the future?
A. Yes, sir; promptly.

"By Mr. Loomis:

"Q. You would advise treatment of that kind? A.
Yes, sir.

"Q. Would have advised it a long time ago if you
had charge of the patient, wouldn't you? A. I am one
of those fellows that aim to give the patient the bene-
fit of all advantages we have.

"Q. You would have advised it when the cause
first originated, would you not? A. I would have ad-
vised him after he got over his shock.

"Q. I mean, got over his pain and suffering caused
by the flesh wounds, you would have advised that treat-
ment at that time, wouldn't you? A. I certainly would,
sir.

"Q. And the failure to apply proper treatment in
your judgment would have a tendency to prolong the
result of the injury, wouldn't it? A. Well, the ob-
ject of any treatment is to cut short the diseases as
quick as possible.

"Q. And in your judgment, proper treatment

would have had some effect in that direction? A. Well, I was of the opinion, sir, that there was a clot somewhere there.

"Q. Just answer the question, doctor, the promptness in the treatment would have been beneficial to the patient? A. It should have been, sir."

Dr. Thompson, an eye specialist, was put on the stand by appellant. He had made one examination of respondent's eyes, and testified that he did not have a sharp and distinct vision in either eye at a distance, but could read an ordinary newspaper with a mild magnifying glass; that neither eye was injured; that they were properly balanced and good eyes, but that he could not see at a distance well; that there was no disease or defect of his eye, but that he simply could not see well far off, but could see close "usually well." Then the following occurred:

"Q. What, if any, treatment would you prescribe for him? A. Well, I think I would leave it alone.

"Q. You say he can read reasonably well at an ordinary distance? A. Ordinary; he could have read the newspaper I handed him, a paper, rather small print, good clear print, and I did not test him without glasses; I just put a mild glass, a magnifying glass on him, probably a glass not as strong as that glass (indicating), and he read that; I did not ask him to read any length of time. I asked him if he could read it, and he says, 'Yes, he could read it.'

"Q. I will ask you to give to the jury your opinion as to the permanency of that condition? A. I am not positive of it, sir, but I think he will get well; I think his vision will return. I am not certain, but I think he will.

"Q. That is your best judgment, is it? A. Yes, sir.

"Q. What is your opinion, doctor, with reference to the probability of his improving in the future? A. I see no reason why he should not."

On cross-examination this physician referred the emaciation to a nervous condition, and reiterated that though he was not absolutely certain, yet he was of opinion respondent would recover his eyesight. On re-examination he said that he had examined respondent's ears; that he had no disease in the ear, but that he was very deaf in his left ear; that he could hear ordinary conversation, but not with his right ear closed; that he would not have discovered he was deaf in one ear if respondent had not told him so.

To both these experts were propounded hypothetical questions, heretofore considered, and which we may omit for present purposes.

It is a significant fact that respondent is not under treatment for his kidneys and has never had his urine tested, and had not been treated for kidney trouble since discharged by Dr. Middleton. It is true that he is still using the medicine formerly prescribed by Dr. Middleton; but that physician testified he was not treating him for his kidneys, that kidney troubles were not in his line of practice.

It is a further significant fact that respondent is not under treatment for his eyes and never has been, nor for ear troubles. In this condition of things the jury gave him $7,500.

Six per cent is a favorite rate of interest in the law. Seventy-five hundred dollars would produce an annual income of $450. Respondent was earning but $480 a year in the prime of his life; so that, the amount of this judgment put at interest at a legal rate would produce an annuity within $30 of his total normal earning capacity.

The evidence at best is weak and largely guesswork on the permanence of his injuries, and the case does not impress us as one where respondent's earning capacity is satisfactorily shown to be practically destroyed. Add to this, that there were some inadvertences in the hot-foot and chance-medley, speaking figuratively and not

technically, of the trial, not amounting to reversible error but prejudicial nevertheless, such, for instance, as repeating over and over again questions (always promptly excluded by the court) directed to showing that a mob was after the motorman, that he had hid out after the accident, and was so published in the newspapers, etc., which appeal strongly to judicial discretion. [Wojtylak v. Coal Co., 188 Mo. l. c. 285, et seq.]

It cannot be denied that in the everyday administration of the law through the courts, enough *flotsam* and *jetsam* may be lodged in the current of a trial to turn the stream of justice awry, as was done in the case last cited, and, possibly, done in this case.

In view, then, of all the foregoing evidence, facts and conclusions, we are reluctantly persuaded the verdict is excessive and that this assignment of error should be sustained. But, on precedent, the case ought not to be reversed on that account if respondent will enter a remittitur. It seems to us that $5,000 would be a good, round, full compensation to respondent.

If, therefore, he will remit $2,500 of his judgment in thirty days the judgment will be affirmed for $5,000; otherwise, reversed and remanded for a new trial.

All concur except *Brace, P. J.,* absent.