### STERLING WHITE V. THE STATE.

No. 2726. Decided December 10, 1913.

**Murder—Misconduct of Jury—Insanity.**

Where, upon trial of murder, defendant's sole defense was that he was insane at the time of the commission of the offense, and it appeared from the record that the jury in their retirement did not pass on the question of defendant's sanity, but discussed the question and believed that a lunacy commission would pass on this question at the penitentiary, of which there was no evidence, the same was reversible error.

Appeal from the District Court of Clay. Tried below before the Hon. P. A. Martin.

Appeal from a conviction of murder in the second degree; penalty, fifty years imprisonment in the penitentiary.

The opinion states the case.

*Taylor & Humphrey* and *Wantland & Parrish,* for appellant.

*C. E. Lane,* Assistant Attorney-General, for the State.

HARPER, JUDGE.—Appellant, from a conviction for murder in the second degree, prosecutes this appeal. His sole defense, as made by the evidence, was that he was insane at the time he killed the young lady. The record discloses that appellant was a young man who had lived an exemplary life up to the time of the commission of this offense. He had been engaged to marry Miss May B. Lee. When the time fixed for the marriage approached Miss Lee postponed the marriage for two months. When the second date approached appellant procured the license, but Miss Lee insisted again on postponing the marriage, this time for two years. Words ensued and the engagement was broken. Miss Lee began receiving company from other young men, when appellant approached her father and asked him to send her away until he could gather his crop, when he would leave, stating at the time he loved her so much that he just could not stand seeing her go with others. Witnesses say that appellant became morose and different from what he had been before. One night Miss Lee was at a party; appellant went to this party, and saw her there with another young man. She passed and he saw the flash of a ring on her hand, when he pulled his pistol and shot her, the shot causing her death. He then turned the pistol on himself, shot himself twice in the breast and once in the head, but none of these wounds proved fatal. The pivotal issue in the case was, was appellant sane or insane at the time he fired the shot. The State's witnesses detail facts that would authorize the jury to find that appellant was sane, and this their verdict would indicate was their finding. Appellant introduced a number of witnesses on the question of his sanity, and these witnesses would have him insane. Mr. Blackstock would have a streak of insanity in appellant's family,—some of his relations being in the insane asylum in Arkansas. Doctors Reed, Foote, Jones and Calhoun all testify that in their opinion he was insane at the time of the commission of the offense. Doctors Reed and Foote were called to see him immediately after the shooting, and waited on him that night and the next morning. Dr. Foote says he was the family physician and had known appellant intimately, and testifies: "I observed his actions and listened to his talk that day while I was there and saw him several times before he was moved to Henrietta, and from his manner of talk and from his actions I am sure he was insane at that time, and I am sure that he did not know the nature and consequences of the act he had committed. He was insane at that time, and he was suffering with that type of insanity known as melancholia. I am sure at the time

I saw him and talked with him that he did not have mind enough to know right from wrong."

The court fairly submitted the issue to the jury and we would not disturb their verdict if it was not for matters that took place in the jury room. On the motion for rehearing there was evidence adduced, and J. F. McNeal, a witness for the State, testified three of the jurymen, Pamplin, Roberts and Coggin, voted, not guilty, giving as their reason they believed appellant was insane, when the following questions were propounded and answers elicited from the witness:

"Q. Now I will ask you if it is not a fact that Pamplin and Roberts stated in the presence of the jury up there that the reason they had concluded to vote with the balance of the jury was because some of the jurors said that there was a commission in the penitentiary that would pass on his sanity or insanity, and that if he was insane he would not have to stay in the penitentiary? A. Well, they did say something of that kind. Q. They did admit to you and the balance of the jurors that the reason they had agreed to convict him, was because some of the jurors had argued that a commission was appointed and there was no danger of his having to stay in the penitentiary if he was insane? A. It is true that there was some talk of that kind, but I could not say there was anything about it being appointed. Q. But the question I asked you was, did not they say that they were willing to convict him because they had learned that there would be a commission down there that would examine him and if he was insane, they would send him to the asylum? A. Yes, this commission they said, there would not be insane men worked in the penitentiary. Q. And that was the reason they would give him a verdict of guilty. A. Yes, sir. Q. That was after some of them had argued that there would be a commission down there to pass on it. A. It was after we had talked about that. Q. Now, then, who was it, if you remember the name of the juror, who advanced the idea that there would be a commission down there to pass on his sanity or insanity? A. Well, Mr. King and I both talked about it, said that we believed there would be arrangements made for crazy men,— that we did not believe they worked crazy men in the penitentiary. Q. You all had argued that before these jurors said if that was so, they would be willing to convict him, hadn't you? A. Yes, sir."

Mr. King was foreman of the jury and testified: "Q. Now, is it not a fact that after you all had retired to consider of your verdict, and soon after you began to discuss these matters, the jurors began to discuss the fact, and you and Mr. McNeal began the argument with the jury, that there was not any danger of this fellow having to serve in the penitentiary, if he was insane,—that there was a commission there that would pass on his sanity, and if he was insane, that he would not have to stay in the penitentiary? A. That question came up,—I said this,—they did not work crazy men in the penitentiary. Q. Is it not a fact that you and Mr. McNeal used the argument to these jurors, that there would be a commission there to pass on his insanity, and that if

he was crazy, he would not have to work in the penitentiary? A. I said this,—they would not work a crazy man there, and had authorities to look after that business,—I did not say commission; that was my opinion. Q. You did not hear any testimony about there being that kind of an arrangement in the penitentiary? A. No, sir. Q. In other words, that argument that you were putting up was not because of any testimony that you heard, or any law. A. That was simply my opinion, and there was no doubt in my mind at the time that there was; but since that I am told there is not. Q. Is it not a fact that Mr. Pamplin and Mr. J. W. Roberts, in the presence of J. F. McNeal, said that if they had such an arrangement there, that they would vote for, Guilty? A. No, sir, I did not hear that. Q. Now then, Mr. King, it was the intention and purpose of yourself to have made those statements for the purpose of letting the jurors see that there was not any danger of an insane man being worked there like a sane man; that was your object? A. That was my opinion, I believed that was true. Q. Now, Mr. King, you are not in a position to say that that did not influence some of the jurors; you giving that opinion? A. No, sir, I do not know what influenced the jurors."

Mr. Coggins was also offered by the State and testified on this issue: "Q. Did you hear them arguing up there in the jury room about there being a commission appointed in the penitentiary to pass on the sanity of men? A. Yes, sir. Q. Tell the court what you heard. A. It was something like this: One man, I kinder believe it was Mr. McNeal, I am not sure about that,—said, 'If the fellow is insane, we have got him, and if he is not, we have got him.' Q. Did he say anything about a commission down there. A. He said that there was a commission down there to pass on the insanity of convicts; that he would go to the asylum if he was insane; and there was another suggestion,—I know that somebody made it,—that the commission down there was better able to pass on the sanity than these doctors around here were."

These were all the witnesses introduced by the State to meet the affidavits filed by appellant's counsel, which we do not deem it necessary to copy, and we have only taken short excerpts from the testimony of these jurymen, as from these excerpts it is manifest that the argument was used that there was a lunacy commission at the penitentiary, and that this commission was better able to pass on the sanity of appellant than the three or four doctors who had testified in the case, and if that commission found appellant was insane he would not be placed in the penitentiary,—as one juryman expressed it, "if he is crazy we have got him, and if he is not crazy, we have got him." Thus it is seen, at least a part of the jury did not pass on the question of whether appellant was sane or insane, but thought a commission at the penitentiary would later pass on the question. As this was the sole question in the case, this character of argument being used, and the facts considered not in evidence, we do not think the verdict should be permitted

to stand, as there is no evidence that such proceedings did not take place.

There are a number of other grounds stated in the motion, and we have reviewed each of them carefully and painstakingly, but none of the others present any error, but on account of the above error, the issue being so sharply drawn by the testimony, we are of the opinion the case should be reversed and remanded.

*Reversed and remanded.*