## BEN BURKE v. THE STATE.

No. 22203. Delivered November 4, 1942.

The opinion states the case.

*Reginald Bracewell,* of Huntsville, for appellant.

**12**

*Spurgeon E. Bell*, State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant was convicted of horse theft, and assessed a penalty of two years in the penitentiary.

There are no bills of exceptions in the record, save one that alleges misconduct of the jury.

Appellant, a crippled old negro man, living by himself in a house on another's farm, was seen by the complaining witness at such witness' home, about a mile and a half from town (presumably Huntsville) in witness' 25-acre pasture, "fooling with the Shetland pony." This was about 2 or 3 o'clock in the afternoon. It was broad open daylight. The witness could see completely across his place from the Riverside Highway which ran thereby. Witness then went into his pasture and got within one hundred yards of this man leading the pony, and holloed to him to turn the horse loose; the man and horse ran for a few steps, and then he turned the horse loose and out-ran the complaining witness. The horse had a baling wire around its neck. The prison dogs were turned loose on the trail and soon came up on appellant sitting on a log in a nearby wooded area. Appellant was identified as the man who had been leading the Shetland pony. This ended the State's testimony.

Mr. Johnson, a storekeeper, testified that he had known appellant for ten or twelve years; that he was just like a child four or five years old, and after detailing some of his dealings with appellant, the witness said:

"He didn't know nothing. In his conversation he would jump from one subject to another. * * * I can tell you that the old man don't know nothing. I don't believe he knows the difference between right and wrong. (Cross examination:) To my judgment I don't believe the defendant knows right from wrong."

Alec Scott, proprietor of a cafe in Huntsville, after detailing his association with appellant, who had worked for witness, said:

"From my observations of him I would say that I don't believe he knows the difference from right and wrong. He was not violent nor didn't anything out of the way when he was with me."

Frank Hamilton, a W. P. A. worker, and preacher as a sideline, after detailing his association with appellant, said:

"From what I have seen of the defendant I don't believe he knows the difference between right and wrong."

The State offered no testimony of any kind in rebuttal of the above three witnesses.

On the motion for a new trial it was shown by Mr. Guerrant, a juror, that it was mentioned in the jury room that the defendant should have testified or taken the stand in order to determine whether or not he was crazy.

Mr. Carsewell, a juror, testified that he heard some member of the jury say that "they ought to have put the defendant on the stand, and we could tell more whether he was crazy or not. That happened when we first went in the jury room. Then some member of the jury stated that the defendant should have had a doctor to examine him—present that evidence so that we would know whether or not he was crazy. Then somebody on the jury said to the effect that if the defendant went to the penitentiary that they would have to give him an insanity trial and someone said they would and if he was crazy it would be dangerous to leave him out by himself and someone said that if he went to the pen it would be a good home for him and he would be better taken care of. It was discussed that if he went to the pen he would have an insanity trial in prison. I just didn't know whether the defendant was crazy or not. I tell the court that the discussions that I heard in the jury room affected my verdict; it probably did.

Cross Examination by Mr. Bennett:

"It was not a long discussion about if he went to the pen he would have an insanity hearing up there. I figured the negro was guilty of stealing the horse all right but as far as the crazy part, I just didn't know. I don't remember who mentioned about the fact that if the defendant went to the pen that he could get an insanity trial."

Mr. Brooks, a juror, testified that he didn't hear any discussion in the jury room relative to the prison authorities giving appellant an insanity trial, and that it would be dangerous to turn him loose, that the pen would be a good home for him,

but he did hear something mentioned that the defendant should have taken the stand so that the jury could tell whether or not he was crazy.

Mr. Ward, a juror, heard none of these remarks, as also did Mr. Miller testify that he heard no such remarks, as did also Mr. Fitzgerald, another juror, testify.

Mr. Bruce, a juror, said: "There was something said about the defendant could have an insanity trial at the pen. Mr. Langley and Mr. Johnson, other jurors denied having heard such statements.

Mr. Gurley, a juror, testified, in substance, that he heard it discussed that if the defendant was sent to the penitentiary they would have to give him an insanity trial; it would be dangerous to leave him by himself; if he was crazy he ought not to be turned loose; the pen would be a good home for him.

Mr. King, the foreman, testified, in substance, that something was said about if the defendant was crazy they would give him an insanity trial in the pen; if he was crazy he ought not be turned loose, it would be dangerous; the pen would be a good home for him; he would be better taken care of there. The juror then said they would just try the case as it was. After the verdict had been agreed upon the foreman said that the pen would be a better home for him than the asylum.

This case is strikingly similar to the case of White v. State, 161 S. W. 977, wherein the jury was called upon to pass on the sanity of the accused, and a final verdict was arrived at after it was said by the foreman of the jury that there were competent doctors in the prison, and if the accused was insane they would so find at the prison, after which the jury voted finding the accused sane, and for such misconduct that case was reversed.

In that case this court said:

"* * * as one juryman expressed it, 'If he is crazy, we have got him, and, if he is not crazy, we have got him.' Thus it is seen at least a part of the jury did not pass on the question of whether appellant was sane or insane but thought a commission at the penitentiary would later pass on the question. As this was the sole question in the case, this character of argu-

ment being used, and facts considered not in evidence, we do not think the verdict should be permitted to stand, as there is no evidence that such proceedings did not take place."

In this instant case, undoubtedly not only was appellant's failure to testify mentioned but we also think that the finding of the jury as to his sanity, prompted by the discussion in the jury room, evidences that the appellant did not receive "a fair and impartial trial."

The allusion to appellant's failure to testify, standing alone and rebuked, and no further mentioned made thereof in the discussion, would doubtless in itself not be sufficient grounds upon which to base misconduct of the jury, but the additional discussion relative to the sanity of appellant, the probability of such a further trial in the prison, and the danger in allowing him to run at large, all in the face of the uncontradicted testimony of the three witnesses testifying as to appellant's insanity, leads us to believe that there is enough evidence of misconduct upon the part of the jury to such an extent that a new trial should be ordered. Therefore the judgment is reversed and the cause remanded.