**Anton Vaughn EVALT, Appellant,**

**v.**

**UNITED STATES of America, Appellee.**

**No. 20040.**

United States Court of Appeals Ninth Circuit.

March 10, 1966.

Rehearing Denied June 13, 1966.

Pope, Circuit Judge, dissented.

William C. Harrison, Spokane, Wash., for appellant.

Frank R. Freeman, U. S. Atty., Spokane, Wash., for appellee.

Before POPE, DUNIWAY and ELY, Circuit Judges.

DUNIWAY, Circuit Judge:

Evalt was convicted of robbing a federally insured bank in the small town of Twisp, Washington, a violation of 18 U.S. C. § 2113(a). He was also convicted of a violation of section 2113(d) in that he put in jeopardy the life of the teller at the bank.

The essential facts of the offense are stated in a written confession which Evalt gave to a representative of the Federal Bureau of Investigation. The confession, in the handwriting of the F. B.I. agent, except for the last paragraph, and the signature, and initialling ("A. E.") of strikeovers and at the bottom of each page (all written by Evalt), reads, in pertinent part, as follows:

"Sept. 9, 1963
Wenatchee, Wash.

"I, Anton Vaughn Evalt, hereby make the following free and voluntary statement to George J. Foster who has identified himself to me as a Special Agent of the Federal Bureau of Investigation. I have been advised that I do not have to make any statement and that any statement that I make can be used against me in a court of law. I have been advised that I have the right to consult an attorney. No threats or promises of reward were made to me to make this statement.

\* \* \* \* \* \*

"I had worked in Twisp, Wash. during the World War II for the U. S. Forest Service as a look out on Birch Mountain.

"I wanted to build a sailboat and so I planned on robbing a bank in order to get money to buy materials to build a sail boat. I decided on a bank in Twisp, Wash. because I was familiar with the area.

"I bought a 1950 Chevrolet 2 door sedan from Ray Gross who lives in Yacolt, Wash. I purchased this car about 2 weeks ago. My home is at Yacolt, Wash. I left Yacolt, Wash. the afternoon of Sept. 4, 1963 driving the ~~Chevrolt~~ [A.E.] Chevrolet enroute to Twisp, Wash. I stopped and slept in the car the evening of Sept. 4, 1963 somewhere south of Chelan, Wash.

"I arrived about 3 miles south of Twisp, Wash. about 9:30 a. m. on the morning of Sept. 5, 1963.

"I pulled off the road and finished a beer there, and then went on into Twisp, Wash.

"I planned on getting to the bank in Twisp, [A.E.] Wash. sometime between 10:15 a. m. and 10:30 a. m. I pulled into Twisp, Wash. at 10:15 a. m. on 9/5/63.

"I was wearing a dark rain coat, sort of a black blue civilian made, I had on ~~pl~~ [A.E.] black pants and tennis shoes, a dark color.

"I was wearing orange rubber gloves. I was wearing a brownish black hunting cap with two silk stockings hanging loose.

"I had an Olympic High Standard short .22 pistol which was mine.

"I pulled up in front of the bank, got out of the car and left the motor running.

"I walked into the bank, up to a male teller, and said 'This is a hold up.' I said to take all the money from his drawer and lay it on the counter. The male teller did this. I had the gun in my right hand and picked the money up with my left hand.

"I ran or walked fast out of the bank, the name of the bank I don't recall, got into the car and drove out of town at a fast rate of speed. [A.E.]

"When I left Twisp, Wash. I drove up Twisp River Road planning on going to Twisp Pass. However the engine started knocking, and I lost ~~all~~ [A.E.] oil pressure, so I pulled off on a side road and stopped on a concrete bridge and set fire to the car. I had the license plates in the back seat of the car and set fire to it in order to burn up the plates. I left the rain coat, the rubber gloves and the silk stockings in the car. I kept the hat.

"I put the money and the pistol in the pack sack, along with the pistol. I didn't spend one cent of the money.

"After burning the car I headed for the Butter Milk Creek Trail and from there to Reynolds Peak, to Twisp Pass, and from there to Eagle Creek Trail and then to Bolder Mountain and from there to Stehekin.

"I arrived at Stehekin at 8:15 p. m. on [sic] Sept. 8, 1963.

"I went into Stehekin, Wash. the morning [A.E.] of Sept. 9, 1963 and tried to find someone to take me to Cascade Pass.

"I found a man ~~named~~ [A.E.] named Ray Burns and started up the pass, and about 14 miles out of Stehekin, Wash. I was arrested by the Sheriff.

"I have Read this Statement consisting of this page & 4 others I have initialed the bottom of each page & the cross-outs this statement is true & correct.

Anton V. Evalt.

"Witness: Ralph D. Hobson, deputy —Chelan County S.O.

George J. Foster, Special Agent FBI

Wenatchee, Wash."

The evidence also shows that before the robbery Evalt loaded the pistol, removed the license plates from the car and installed behind the back seat, as a protection against bullets, a 12 x 4 inch plank, and that at some time, either before or after the robbery, he chiselled off the number of the motor.

His plea was "Not guilty, by reason of temporary insanity." A plea in that form is not provided for by federal law, but, of course, the defense of insanity is encompassed within the plea of not guilty. He was tried twice, and was con-

victed on both counts at the conclusion of the second trial.

Evalt makes the following contentions on this appeal:

1. He was unlawfully arrested without a warrant, and the search of his person and of a pack sack that he was carrying was therefore also illegal.[1]

2. The court erroneously received testimony from the sheriff as to certain statements made by Evalt because the arrest was illegal and the sheriff did not advise him of his constitutional rights before questioning him about the offense.

3. Confessions that he made to certain newspaper reporters, to the FBI agent, and to two deputy sheriffs should not have been received in evidence because the arrest was illegal, he had not been advised of his constitutional rights, he did not have a lawyer, and the officers did not get in touch with his wife after he asked them to do so. He also claims that his physical condition was such as to make the confession or confessions involuntary.

4. He was not taken before a United States Commissioner as promptly as he should have been and before he was interrogated by the newsmen and the FBI agent.

5. The evidence shows that he was insane as a matter of law when he robbed the bank.

6. It was plain error for the trial court to permit the United States Attorney to tell the jury that if they acquitted Evalt he would walk out of the court a free man, while at the same time the court refused to permit defense counsel to argue that, if Evalt were acquitted, psychiatric assistance and care would be available to him through the United States Navy.

7. It was error to permit the sheriff and two of his deputies to express an opinion as to his sanity.

1. *The arrest was lawful and the incidental search was therefore permissible.*

The town of Twisp, located at the junction of the Methow and Twisp Rivers, lies in a mountain valley a few miles north and east of Lake Chelan. The lake is narrow and fjordlike, some 55 miles long, and runs from the town of Chelan at its eastern end, at the foot of the Cascade Mountains, into the heart of the eastern part of the Cascades. The valley of the Twisp River runs roughly parallel to Lake Chelan and is separated from it by a high ridge which is exceedingly steep and rough. The town of Stehekin is situated at the upper end of the lake and about 35 air miles from Twisp. It is an isolated community which cannot be reached by road. The only road at Stehekin is one running some twenty miles or so up the Stehekin River to the foot of Cascade Pass, where it ends. Access to the town is by airplane or by boat up Lake Chelan. The town itself is a tiny village.

The offense occurred on September 5, 1963, a Thursday. After Evalt robbed the bank, he proceeded up the Twisp River to the point where he burned the car. He took to the hills carrying a loaded rifle and the pack sack. He had no camping or sleeping equipment. He wandered in the mountains during the remainder of the day on the 5th, and on the 6th, 7th and 8th. He made his appearance at Stehekin on the evening of the 8th, a Sunday. The next morning he approached one Bird, a resident of the area, and asked Bird to take him by car from Stehekin to the foot of Cascade Pass. Evalt's intention apparently was to hike over the pass and down into the valley of the Skagit River at the town of Marblemount, several miles away.

News of the bank robbery had preceded Evalt to Stehekin. When he accosted Bird on Monday morning, September 9, Bird, because of his behavior and appearance, suspected that he was the Twisp

1. He did not, however, and does not, seek to suppress the pistol, ammunition, and money taken from the pack sack. They were all received in evidence without objection.

robber. Bird caused the sheriff of Chelan County at Wenatchee to be notified by radio that a person who appeared to answer the description of the Twisp bank robber was in the Stehekin vicinity. The sheriff proceeded immediately to Chelan where he met a Mrs. Young, who had seen Evalt standing beside his car outside of Twisp a few minutes before the bank robbery, and had so notified the sheriff after seeing a newspaper photograph of the burned Chevrolet. The sheriff and his brother, who was a pilot, accompanied by Mrs. Young, then flew to Stehekin, where they were met, by prearrangement, at the Stehekin airport by a car and driver. The latter had agreed with Bird that Bird would stall, and would proceed up the road with Evalt as slowly as possible, so that the sheriff could overtake him before Evalt could get away again into the mountains. In this Bird was successful; he used the pretext of talking to the driver of a passing truck. The sheriff, accompanied by his brother, Mrs. Young and the driver, overtook Bird and his passenger about 14 miles out of Stehekin, where Bird's car was stopped; Evalt was sitting in the front seat of Bird's car with a loaded rifle beside him.

Knowing that Evalt had robbed the bank at gunpoint, the sheriff did not wish to endanger Mrs. Young. He therefore left the car, wearing his badge and with a gun in his hand, and "progressed very rapidly"[2] to the Bird car where Evalt was sitting. He told Evalt that he was the sheriff, got Evalt out of the car at gunpoint, took the rifle, handcuffed him, searched him, opened the pack sack that Evalt had between his feet in the car, and found in it a loaded .22 caliber pistol and a substantial quantity of money. He then had Mrs. Young identify Evalt. The group, with Evalt, returned in the car to Stehekin. The sheriff and his brother, with their prisoner but without Mrs. Young, returned by plane to Chelan and by car to Wenatchee.

Appellant's attack upon the arrest rests upon the following contentions: that the sheriff had never seen the bank robber and did not have any way of identifying him himself, but nevertheless proceeded to arrest Evalt before Mrs. Young, who had been brought along for that purpose, identified him. Consequently, it is claimed, the arrest was without probable cause and illegal and the search of the pack sack was not incident to a lawful arrest and so was also illegal. The subsequent identification by Mrs. Young, appellant says, cannot make either the arrest or the search legal. We do not think that the law of arrest and search and seizure is so neatly formalistic.[3] It was known to the sheriff that the bank had been robbed and that the robber had taken to the hills. It was known to the sheriff that a man believed to answer his description had appeared at Stehekin and was in Bird's car. These facts, we think, gave the sheriff reasonable cause to arrest that man. It was known that the man was armed when he robbed the bank. Under the circumstances, it would have been a rash act for the sheriff to have taken Mrs. Young with him to Bird's car to help him identify

---

2. Why is it that a police officer, when testifying, almost never says that he "walked fast" or "trotted" or "ran"?

3. The sheriff testified that he arrested Evalt after he discovered the pistol and the money, but before Mrs. Young identified Evalt. We assume, but do not decide, that the arrest occurred when Evalt was ordered out of the car. The arrest was by a Washington officer, not a federal officer. See State v. Sullivan, Wash., 1964, 395 P.2d 745; State v. Brooks, 1960, 57 Wash.2d 422, 357 P.2d 735. The facts in United States v. Di Re, 1948, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210, and Johnson v. United States, 1948, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 are quite different. In neither case was there probable cause for the arrest; in each, it was the search (illegal because there was no probable cause for search) which furnished the only legal cause for the arrest. This, of course, puts the cart before the horse. As was said in *Johnson*, one cannot "justify the arrest by the search and at the same time justify the search by the arrest." (Pp. 16–17, 68 S.Ct. p. 370) See also Henry v. United States, 1959, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134.

Evalt before he was disarmed. It would have been equally rash for the sheriff to have approached Evalt in any manner other than with a gun. When the sheriff made the arrest, Evalt had a loaded rifle at his side. Having found the man that he had been told about on the radio, the sheriff proceeded in the most prudent way in which he could have proceeded, and we think that at that point he had a right to open the pack sack. A search of a person legally arrested, and of his immediate possessions, is lawful. See Preston v. United States, 1964, 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed.2d 777. The contents of the pack sack itself merely confirmed the sheriff's already reasonable belief that he had the right man. The further identification by Mrs. Young is not legally relevant here.

2. *The statements made to the sheriff after the arrest were properly admitted.*

At the time of his arrest, Evalt told the sheriff his name and that he was a petty officer in the United States Navy. The trip from the point of arrest to Wenatchee, by car, plane, and car again, took about two hours and a quarter. During the trip, the sheriff asked Evalt how he happened to rob the bank. Evalt said that he didn't really know, that it didn't make sense, but that he robbed the bank so that he could build a sailboat, that he needed money to build a sailboat. The rest of the conversation concerned the manner in which Evalt planned to get out of the Stehekin area by going over Cascade Pass. He also told the sheriff, in response to an inquiry, that he had not changed the engine in the car, but that he wished that he had because if he had changed it, he would not have been with the sheriff, but would have been

able to proceed up the Twisp River and to escape over another pass.

The sheriff did not tell Evalt that he need not answer any questions or that he was entitled to consult an attorney before engaging in these conversations. At some time during the trip, however, Evalt asked the sheriff if the latter thought that an attorney would help him, and the sheriff told him: "I thought that he should procure an attorney, that although I expressed doubts about his perhaps not being able to win the case, that the attorney should represent him and represent his interests." Nothing in the evidence would even support an inference that Evalt was unwilling to talk with the sheriff. There is ample evidence that his mind was functioning normally,[4] and that the sheriff used no pressure or threats to get him to talk. The inference would have to be that Evalt was not only willing but really glad to talk.[5]

■■ The law has not yet moved to the point where an arresting officer may never, in connection with or following the arrest, ask the suspect questions about the offense, without first warning him of his privilege to remain silent or of his right to counsel. Nothing in the record compels a holding that Evalt's statements to the sheriff were not voluntary. The sheriff testified that he was not taking a statement from Evalt, that he did not know enough about the crime to do so; that he was merely inquiring out of curiosity, as to how Evalt intended to get out of the mountainous country. Circumstances sufficient to sustain the arrest did point to Evalt as the robber. But the sheriff, while he thought Evalt was the robber, did not know enough to do more than inquire. He was not yet

4. Evalt was obviously tired. All witnesses agree on this. But they all also agree that he was coherent and rational. Evalt testified that he drank a great deal of beer before he robbed the bank. But there is no testimony that he had any thereafter, a period of four days, or that he showed any signs of being under the influence of alcohol when arrested or thereafter. Evalt's testimony would indicate that he had the "D.T.s" while in the mountains, but that his mind had cleared before he reached Stehekin.

5. The Fifth Amendment to the Constitution provides:
"* * * nor shall any person * * * be compelled in any criminal case to be a witness against himself."
We can find no compulsion here.

in a position to accuse. His purpose was not to elicit a confession. No determination to prosecute, or as to whether the prosecution would be by the state or by the United States, had yet been made.[6]

### 3. *The confessions.*

#### a. *To newspaper reporters*

The sheriff advised his office, by radio, that he was bringing in a man whom he believed to be the Twisp bank robber. His office notified the local newspaper in Wenatchee. He told Evalt, before they reached Wenatchee, that reporters would want to interview him, and that "it would not be necessary for him to talk to any reporters at all unless he cared to talk to them." Evalt made no reply. Evalt asked the sheriff to call his wife, both during the trip to Wenatchee and when he was brought into the jail there. A deputy did try to place the call, but was unable to reach her, as no one answered the phone. This was within 15 minutes of the time (2:45 P.M.) when the party arrived at the jail. Evalt was booked at the jail at 2:50.

At the jail there were present several of the sheriff's deputies, F.B.I. agent Foster, and two reporters, one with a camera, who took pictures of Evalt. Immediately after Evalt was booked, he was interviewed by both reporters. They had the permission of both the sheriff and the F.B.I. agent to talk to Evalt, and Evalt was brought to a room for the purpose. Evalt did not object. Neither of the officers told Evalt, at that time, that he need not talk to the reporters. Nobody, and particularly not the reporters, then told him that he need not talk to them, or that what he said to them might be used against him. Nobody then informed him of his right to counsel. Neither the sheriff nor the F.B.I. agent was present during the interview, but a deputy sheriff was present. He did not, however, participate, nor was he a witness in the case; apparently, his only function was to act as a guard.

The interview began with a statement by the reporter who asked most of the questions, "that perhaps if he [Evalt] would tell a story it might prevent some other person from doing the same thing." Evalt "expressed a willingness to talk," and did so at length, giving the reporters what amounts to a full confession. This, with his picture, later became the basis of a newspaper article, published the next day. The interview lasted 20 minutes to half an hour, during which Evalt and the reporters were standing up. Evalt was tired—"very tired—and his eyes had a sort of a blurry look in them, kind of a —well, just a tired look." He was coherent and responsive, but "He didn't make long answers, and so I had to keep questioning to draw out full answers." But he did not appear sleepy.

Toward the end of the interview, Evalt asked the reporters to telephone his wife. He did not in any way condition his talking to them upon their making the call. Following the interview, one of them did so, reaching her at the Evalt home in Yacolt, some 300 miles away. It took him until 4:15 to get the call through. Both reporters were on the phone, one doing the talking, the other listening. The conversation, with an obviously distraught woman, was used as part of their story. Nothing was said about consulting an attorney, either by Evalt to the reporters, or by them to him, or in their talk with Mrs. Evalt, either by them or by her. She did ask one of the reporters what she should do, and he said that he didn't know "because I didn't know where they were going to take him." He was trying to prevent her from making a useless trip to Wenatchee. After the phone call, one of the reporters called the sheriff's office and left word that he had called Mrs.

---

6. Thus, we think that the decision in Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 is not here controlling. See Morales v. United States, 9 Cir., 1965, 344 F.2d 846, 851; United States v. Cone, 2 Cir., 1965, 354 F.2d 119; United States v. Robinson, 2 Cir., 1965, 354 F.2d 109; Cf. Hiram v. United States, 9 Cir., 1965, 354 F.2d 4; Kohatsu v. United States, 9 Cir., 1965, 351 F.2d 898.

Evalt. This, however, was not communicated to Evalt. Evalt himself was never given a opportunity to call his wife. Both reporters were government witnesses.[7]

 To say that we regard this episode with distaste is to put it much too mildly. Our feelings about it, however, are not, in themselves, a sufficient ground for holding that there was prejudicial error. Objection was made to the testimony of the first of the reporters to testify on the ground that the arrest was illegal and that Evalt "was taken into custody without a warrant of arrest and without being advised of his constitutional rights."[8] No objection was made to the testimony of the other reporter. A sufficient objection having been made to the testimony of the first reporter who took the stand, no repetition of it was needed when the second reporter was offered as a witness. (McCormick, Evidence, p. 120, n. 45, (1954); Salt Lake City v. Smith, 8 Cir., 1900, 104 F. 457, at 470–471; Union Electric Light and Power Co. v. Snyder Estate Co., 8 Cir., 1933, 65 F.2d 297 at 303.)

 It may be claimed that the objection was not good because the reporters were not government representatives, so that the constitutional privilege against self-incrimination and right to counsel did not protect his client when he talked to them. (Burdeau v. McDowell, 1921, 256 U.S. 465, 475–476, 41 S.Ct. 574, 65 L.Ed. 1048; United States v. Goldberg, 3 Cir., 1964, 330 F.2d 30, 35; United States v. Ashby, 5 Cir., 1957, 245 F.2d 684, 686). We think, however, that this principle does not apply here. The reporters, as they and the sheriff both well knew, could not talk to Evalt without the sheriff's permission.[9]

The sheriff made Evalt available to them, and kept him under guard during the interview. This, we think, was action by the state, and therefore the constitutional guarantees apply to the interview.[10]

 Did the interview violate Evalt's constitutional right? We have reluctantly concluded that it did not. The evidence that Evalt willingly talked to the reporters is uncontradicted. So is the evidence that he was told by the sheriff that he did not have to talk to the reporters, and that he knew, although he had not been officially advised, that he was entitled to counsel. He did not ask for counsel.[11]

7. After she got the phone call, Mrs. Evalt did consult an attorney at nearby Vancouver, Washington, by telephone. Then she called the jail, apparently the next day, and learned that Evalt had been taken to Spokane. She went to Spokane on the 11th and there retained counsel, who has represented Evalt ever since.

8. The objection based on the claimed invalidity of the arrest was without merit. The objection that Evalt had not been advised of his constitutional rights does, we think, raise the question that counsel now seeks to present, but as to only one of the witnesses.

9. Cf. Anderson v. United States, 1943, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829. We do not add the permission of the F.B.I. agent. So far as appears, Evalt was in state custody rather than federal custody when the interview occurred.

10. Cf. Massiah v. United States, 1964, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246. The present case differs; the reporters were not employees of the state or of the United States. But they were given access to Evalt only because they wanted to ask him questions, and this was done by the sheriff. We do not here deal with a situation like that in Stowers v. United States, 9 Cir., 1965, 351 F.2d 301.

11. Much is made of Evalt's desire to have his wife called. Attempts were made, in apparent good faith, to reach her. But there was no condition imposed, i. e., making the call was not conditioned upon his first talking about the crime. We cannot find in this record the kind of evidence leading to the conclusion that confessions were the result of compulsion that appeared in the cases on which Evalt principally relies. See, e. g., Haynes v. State of Washington, 1963, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513; Lynumn v. State of Illinois, 1963, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922; Reck v. Pate, 1961, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948. There is some conflict between Evalt's version of what happened and that of the reporters and officers. It was for the trial court and the jury to resolve such conflicts, and they have done so, against Evalt's contentions. See United States v. Page, 9 Cir., 1962, 302 F.2d 81. See also footnote 6, supra.

Escobedo, supra, does not require the use of a particular verbal formula; it does not deal in magic words. It deals with substance, not mere form.

Newspaper interviews with suspects, however, are fraught with the gravest danger to the administration of justice. They create the probability, especially where, as here, they result in the publication of a confession, that the defendant will be unable to get a fair trial. (See Estes v. State of Texas, 1965, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543; Report of the President's Commission on the Assassination of President Kennedy, 1964, at 231-42; LeWine, What Constitutes Prejudicial Publicity in Pending Cases?, 51 A.B.A.J. 942 (1965)).[12] They are further subject to abuse because reporters, unlike officers of the law, are under no legal obligation to protect the constitutional rights of the accused. Too many of them seem to regard it as their right and duty to "get the story" regardless of whose rights they may invade or how they may invade them. It was certainly no part of the duty of the sheriff or the F.B.I. agent to permit, much less to arrange, for such an interview as here occurred, nor to use the newspapermen to do their job for them. No more was it the duty of the prosecutor to use the reporters as witnesses. The persistence of prosecutors in getting possible error into the record by using unnecessary but questionable evidence is a constant source of astonishment to us.

We cannot prevent law enforcement officers from permitting such interviews. (Cf. Cleary v. Bolger, 1963, 371 U.S. 392, 83 S.Ct. 385, 9 L.Ed.2d 390). But we can, in the exercise of the supervisory power over the administration of criminal justice in the federal courts, prevent the use of the interviewing reporters as government witnesses.[13] We hold that the testimony of the report-

ers should not have been received. We do not confine this ruling to confessions. Our holding is that the government may not use evidence obtained in the way that this evidence was obtained. It is urged that, if inadmissible, the testimony was harmless, in view of the other testimony in the record, and particularly of the fact that Evalt admitted what he did and based his whole defense upon insanity. We do not pass upon this question, because the judgment must be reversed for other reasons, as is shown hereafter.

b. *To the F.B.I. Agent.*

While Evalt was being booked and interviewed by the reporters, Agent Foster was checking the currency found in the pack sack against a list of "bait money" kept by the Twisp bank. When he found that there was a substantial number of bills that came from the bank, he told the sheriff, "We want him." He then obtained the confession that is set out above. We assume that at that point the matter had reached the accusatory stage. But Evalt was fully advised of his rights by Foster. Following the receipt of such advice, Evalt said, "I want to get it over with" and "I did it; I'd just as soon tell you about it." It is not claimed, nor could it be on this record, that the confession to Foster is the "fruit of the poisonous tree," i. e., of the newspaper reporter interview. Evalt's constitutional rights were not infringed.

It is claimed, however, that Evalt should have been taken before the U. S. Commissioner before being interviewed by Foster, and that, because he was not, the confession should have been excluded under the rule in McNabb v. United States, 1943, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 and Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479. The difficulty is that in this case the record does not

12. Here, no attempt was made to show that Evalt could not get a fair trial, perhaps because the trial took place at Spokane, a much larger community and a long way from Wenatchee and from Twisp.

13. See Note, The Supervisory Power of the Federal Courts, 76 Harv.L.Rev. 1656 (1963).

support the claim. Evalt was booked into the jail at 2:50 P.M. Foster finished his checking of the money between 3:15 and 3:30. He then talked with Evalt, completing the interview at about 4:00. At around 5:00, the U. S. Commissioner arrived at the jail and Evalt was arraigned. Nothing appears in the record as to the location of the Commissioner's office, or whether he was available sooner. The time lapse was, at most, two hours. More realistically, it was an hour and a half, beginning at the time when Foster said "We want him." Up to that time, Evalt was a state prisoner. We cannot say, as a matter of law, that this amounts to "unnecessary delay." (Rule 5(a), F.R.Crim.P., Muldrow v. United States, 9 Cir., 1960, 281 F.2d 903.) And no facts appear that require the conclusion that there was in fact unnecessary delay. It is still the law that officers, both state and federal, are presumed to have done their duty. It is still the law that we do not presume error. We are also entitled to assume that, if he could have shown that the delay was unnecessary, Evalt's counsel would have done so. He did not.[14]

#### c. *To the deputy sheriffs.*

 Deputies Horner and Beck talked to Evalt in the jail at about 5:30, after he had been arraigned. There is no claim that the Commissioner did not advise Evalt as to his rights, as required by Rule 5. The deputies also advised him. They obtained a full oral confession, corroborative of the one given to agent Foster and of the statements made to the sheriff. Both deputies testified as to Evalt's physical condition, their advice to him as to his rights, and his willingness to talk. Horner detailed the confession. For reasons already given, there was no error.

#### 4. *Delay in taking Evalt before the U. S. Commissioner.*

See discussion under 3b, supra.

5. *Evalt was not, as a matter of law, insane.*

 Evalt's defense was based entirely upon his legal insanity at the time that he committed the offense. There is much in his history and in his behavior, and there is psychiatric testimony, to support this defense. But there is also much in his behavior, and there is psychiatric testimony, to refute it. The issue was one of fact for the jury, not one of law, either for the trial court or for this court. The jury determined the question against him. The evidence supports the determination.

6. *It was error to permit the prosecutor to tell the jury that, if acquitted, Evalt would walk out a free man.*

Just before the case was argued, the following colloquy occurred between court and counsel:

"MR. HARRISON: [Counsel for Evalt] I have one matter prior to the motion, and this is in regard to the question of what is the future treatment of the defendant or available to the defendant in the event of an acquittal. During the past first trial this question came up in the reappearance of the jury at various times, this question came out and they were concerned about it, and Mr. Freeman and I have both been apprised by Chaplain Albrecht as to the Navy's intentions in this event, and I was wondering if Counsel might agree to stipulate that the jury might be apprised in some manner that there is psychiatric treatment available from the Navy in the event he is found not guilty by reason of temporary insanity. I know this was gone into by both of us with Captain Albrecht.

MR. FREEMAN: [Government counsel] Your Honor, the answer to that is there is no psychiatric treatment

---

14. Carnley v. Cochran, 1962, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70, is not to the contrary. It holds that waiver of counsel cannot be presumed. It does not overturn the general rules on which we here rely. See Lipton v. United States, 9 Cir., 1965, 348 F.2d 591, 594.

available for this gentleman in the Navy.

THE COURT: I don't see what that has to do with this lawsuit.

MR. FREEMAN: That's right. It's guilty or not guilty as far as we are concerned here.

THE COURT: That is as I understand the law. If there is a verdict of not guilty he goes free, and there is nothing anybody can do in the way of restraining him. We have enough problems in this lawsuit without getting into others. No, I will forbid either Counsel to touch or dwell on the matter."

\* \* \* \* \* \*

"MR. FREEMAN: I have this in mind, your Honor: I have no wish to trespass upon the Court. I would want to state to the jury that their verdict must be either guilty or not guilty. If they find him not guilty, then he walks out of this courtroom a free man.

THE COURT: Oh yes, I will permit you to do that. I mean what treatment might be available to him in the future in the Navy has nothing to do with this lawsuit.

MR. FREEMAN: Oh, no.

THE COURT: Those are the alternatives that you stated, and I will permit either Counsel to do that."

This concluded the colloquy. Counsel for Evalt did not enter an objection to the two last quoted statements of the court. Counsel for Evalt abided by this ruling.

The final sentence of the closing argument for the government is as follows:

"If you find him not guilty, he walks out of this courtroom a free man, and I know, ladies and gentlemen, that you are not going to turn this man loose again on society."

Again, counsel for Evalt did not object.

■ The dissenting opinion of our Brother Pope urges that, by failing to object, counsel waived the point that he now makes. Ordinarily, this is and should be the result of failure to object, as the cases cited by Judge Pope, and countless others, hold. But the rule is not absolute. Rule 52(b) F.R.Crim.P. provides:

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

This is an express exception to Rule 51, which is the counterpart of Rule 46 F.R. Civ.P., cited by Judge Pope. We note, too, that Rule 51 states: "\* \* \* but if a party has no opportunity to object to a ruling or order, the absence of an objection does not thereafter prejudice him."

■ We think that we should here apply Rule 52(b). During the colloquy quoted above, the problem was brought to the court's attention, although the precise form that the prosecutor's final argument took was not. The court then indicated, in no uncertain terms, what its views were. Under these circumstances, we think that to require an objection, at the end of the colloquy, is to exalt form over substance. When the prosecutor made his closing statement, defense counsel was confronted with an impossible dilemma. He already knew the court's views, and could anticipate that an objection would be overruled. He also must have known that to make an objection at that point and have it overruled would greatly magnify the importance of what the prosecutor had said, in the minds of the jury. We cannot, in these circumstances, accuse him of being unfair to the trial judge. This is, to us, within the spirit, if not the letter of the proviso in Rule 51, quoted above. Moreover, when we must choose betwen fairness to the trial judge and fairness to the defendant, in a matter as crucial to the result as this appears to us to be, we must choose fairness to the defendant, who is the one whose liberty is at stake.

The record indicates that government counsel's statement to the court is incorrect. An affidavit of Captain Herbert Albrecht, Chaplain's Corps, U.S. Navy, states:

"That after conferring with legal and medical representatives of the Com-

mandant, Thirteenth Naval District, it is my understanding that under current Navy procedures, Anton Evalt, if found not guilty by reason of insanity, would be transferred to the Naval Hospital, Bremerton, Washington for psychiatric evaluation and given further evaluation at the U.S. Naval Hospital, Oakland, California;

That if Naval psychiatrists find, after weighing all available evidence, that Anton Evalt is suffering from mental disease or disorder, he will be required to appear before a Physical Evaluation Board which will make recommendations to the secretary of the Navy as to disposition of Anton Evalt;

That if Anton Evalt is found to be suffering from mental disease or disorder, he will undoubtedly be transferred to a Veterans Administration Hospital for further handling and treatment;"

And affidavits by two jurors state that each of them, and "a few jurors," had and expressed doubt as to Evalt's sanity at the time of the robbery but felt, because of the prosecutor's closing statement, that they had no choice but to convict. They further state that, if they had known that Evalt could receive treatment, they would have voted to acquit.[15]

It may well be that, in a case in which insanity is not a defense, a comparable argument to that made here would not be prejudicial. We decide only the case before us. But here the sole defense was insanity, and the prosecutor's argument to the jury—the last thing the jury heard from counsel—was, in substance, an invitation to convict, for the protection of society, even though the jury might believe Evalt to have been insane. This, we think, was fundamentally unfair.

 In cases such as this, where the jury has nothing to do with fixing the penalty, the jury's sole concern is guilt or innocence. It should not concern itself with what punishment the defendant may receive, or whether, if acquitted, he would or would not "walk out of this courtroom a free man" or whether they would "turn this man loose again on society." The prosecutor's argument was prejudicial, and the prejudice was enhanced by the court's limitation on defense counsel. The effect of the court's rulings was to tilt the scales of justice in the government's favor, and this in a manner and at a time that made it impossible for defense counsel to redress the balance. The court should have imposed upon the prosecutor the same restriction as to the effect of a verdict of not guilty as it imposed upon the defense. This, we think, is preferable to permitting both sides to

15. We do not here pass upon the vexed question as to whether affidavits of jurors may be received to impeach the verdict. See McDonald v. Pless, 1915, 238 U.S. 264, 267, 35 S.Ct. 783, 59 L.Ed. 1300; Hyde v. United States, 1912, 225 U.S. 347, 384, 32 S.Ct. 793, 56 L.Ed. 1114; Mattox v. United States, 1892, 146 U.S. 140, 149, 13 S.Ct. 50, 36 L.Ed. 917; United States v. Reid, 1851, 53 U.S. [12 How.] 361, 366, 13 L.Ed. 1023; Walker v. United States, 9 Cir., 1962, 298 F.2d 217; Medina v. United States, 9 Cir., 1958, 254 F.2d 228; Bryson v. United States, 9 Cir., 1956, 238 F.2d 657. Compare Klimes v. United States, 1959, 105 U.S.App.D.C. 23, 263 F.2d 273; United States v. Grieco, 2 Cir., 1958, 261 F.2d 414; Stephenson v. Steinhauer, 8 Cir., 1951, 188 F.2d 432, 439; Davis v. United States, 5 Cir., 1931, 47 F.2d 1071;

State v. Gardner, 1962, 230 Or. 569, 371 P.2d 558. Under most of the foregoing cases, the affidavits would probably be both inadmissible and insufficient to impeach the verdict if admitted. We cite them only as illustrating that our view as to the prejudicial nature of what happened here is by no means a figment of the oversensitive imagination of those who inhabit the ivory tower of the appellate bench. Further confirmation is found in that portion of the record that relates to the first trial, at which the jury was unable to agree. They sent notes to the judge, during their deliberations, asking the following questions: "Can jury give verdict of guilty with recommendation of psychiatric treatment? Can jury give verdict of not guilty with recommendation that defendant be committed to mental institution?"

argue about the effect of the verdict.[16] In this case, at least, the matter may well have been of crucial importance in the minds of the jurors.

7. *Lay testimony as to Evalt's sanity.*

■ It was shown that the sheriff and the two deputies had had considerable contact, in the course of their duties, with insane persons and persons claimed to be insane. With this foundation, their testimony as to their opinions of Evalt's sanity was properly admitted.[17]

Other claimed errors do not require comment, as they are not likely to arise on a new trial.

The judgment is reversed, and the matter is remanded for a new trial.

ELY, Circuit Judge (concurring):

I must agree that the appellant was severely and improperly prejudiced by the challenged remarks made by the prosecuting attorney in his final argument to the jury. I reject the suggestion of my Brother Pope that the defense of insanity, of itself alone, has impelled the majority to a conclusion which, absent the defense, might have been to the contrary. In evaluating the propriety and effect of the argument which is claimed to have been prejudicially improper, it must be placed in perspective. The background is composed, only in part, by the defense itself. Contributing to it are all of the circumstances which are fairly shown by the record.

Here, the appellant had enjoyed a career of many years of honorable service in the United States Navy. At the time of the commission of his offense, he held the rank of Chief Petty Officer, was the head of a family, and could look forward, within a comparatively short time, to retirement and attendant benefits. In the record of his life, there was no history of the commission of crime, and yet, inexplicably, he robbed a bank at gunpoint and, fleeing, roamed as a wild beast through the Washington wilderness. From this conduct it fits every test of reason to infer that appellant, unrestrained, would constitute a dangerous menace to society. The prosecutor told the jury, in effect, that if the appellant were acquitted, he would walk from the courtroom a free man, loose for the possible immediate release of the force of further unlawful violence upon the community. The argument may have been reinforced by the prosecutor's prestige as an officer of the United States. The representation made by the prosecutor was incorrect. The defense had no opportunity to reply, and it had been enjoined from, in its own argument, making a valid answer in anticipation.

I have said that the prosecutor's representation was mistaken, and this conclusion is supported by the affidavit of Navy Captain Albrecht, quoted by my Brother Duniway. Moreover, we know from actual experience and common knowledge that the armed forces maintain strict regulation and supervision over their active members, especially those suspected of illness. It is inconceivable to me that the United States Navy, mindful of Evalt's years of honor-

16. Compare: State v. Jordan, 1956, 80 Ariz. 193, 294 P.2d 677; People v. Morse, 1964, 60 Cal.2d 631, 36 Cal.Rptr. 201, 388 P.2d 33; People v. Mallette, 1940, 39 Cal.App.2d 294, 102 P.2d 1084; People v. Johnson, 1960, 178 Cal.App.2d 360, 3 Cal.Rptr. 28; People v. Castro, 1960, 182 Cal.App.2d 255, 5 Cal.Rptr. 906; Williams v. State, Fla., 1953, 68 So.2d 583; State v. Berry, 1950, 241 Iowa 211, 40 N.W.2d 480; State v. Johnson, Mo., 1954, 267 S.W.2d 642; Mott v. State, 1951, 94 Okl.Cr. 145, 232 P.2d 166; Burke v. State, 1942, 145 Tex.Cr.R. 11, 165 S.W.2d 458. We agree with the view

of the California Supreme Court (People v. Morse, supra), where it quoted with approval from State v. White, 1958, 27 N.J. 158, 142 A.2d 65, as follows:

"The jurors perform their task completely when they decide the matter assigned to them upon the evidence before them. What happens thereafter is no concern of theirs."

17. Connecticut Mut. Life Ins. Co. v. Lathrop, 1884, 111 U.S. 612, 619–620, 4 S.Ct. 533, 28 L.Ed. 536; Edmonds v. United States, 1959, 106 U.S.App.D.C. 373, 273 F.2d 108, 114; 2 Wigmore, Evidence, § 568 (1954).

able service, would have so far neglected its responsibility and its obligation as to abandon him upon his acquittal by reason of insanity and fail to provide all necessary restraint and medical attention. If the trial judge properly forbade defense counsel to make known to the jury the Navy's intent concerning the custody of Evalt in the event of acquittal, then at the same time the prosecutor should have been forbidden to utter his own incorrect and unsupported prophecy.

Finally, I see the record as clearly revealing the communication to the judge of adequate warning of the possibility of error in permitting argument by either party upon the subject. Upon inquiry by defense counsel as to whether or not he might make the argument which would have constituted a reply to that of the prosecution, the trial judge, properly I think, under the state of the record, replied, "No, I will forbid either Counsel to touch or dwell on the matter." Compliance with this direction would have eliminated our problem, but the prosecution, by perseverance, persuaded the trial judge to retreat from his ruling as to it and thus acquired an advantage which I, with my Brother Duniway, cannot approve. After the discussion between the Court and counsel, it is surely understandable that defense counsel would have justifiably anticipated the overruling of objection to prosecution argument to which, although improper under the circumstances, the trial judge had already given approval. Although there are technicalities which attend most rules, they should not be interpreted or applied so as always to require indulgence in procedural steps of predetermined uselessness.

POPE, Circuit Judge (dissenting):

The primary, perhaps the sole basis for the court's decision is the use by the prosecuting attorney of the final sentence in his closing argument as follows: "If you find him not guilty, he walks out of this courtroom a free man, and I know, ladies and gentlemen, that you are not going to turn this man loose again on society." In the first place I cannot agree that such a statement contained in Government counsel's argument is beyond the limits of permissible advocacy. In large measure the statement is rather meaningless because the jury, if they have any sense whatever, ought to know the different consequences of the two possible verdicts. They know perfectly well that a verdict of not guilty permits the defendant to go at large.

My limited experience makes me believe that almost any prosecutor says to the jury, expressly or impliedly, "Do not turn this guilty man loose upon society." After all while the prosecutor should be scrupulously fair in presentation of his case, he is nevertheless required to be an advocate; and it is my opinion that an argument of this kind is not beyond the proper scope of advocacy, even in a case involving defense of insanity.[1] Appropriately cited here is what we said in Bush v. United States, 9 Cir., 267 F.2d 483, 488: "Merely because a statement is made or question asked by court or counsel in the heat of a spirited trial which subsequently in the cool ivory tower of appellate court chambers seems inappropriate, does not make the stating nor the asking prejudicial error." [2]

The opinion does not question but that in an ordinary case there would be no er-

---

1. Not only jurors, but judges as well, may be concerned about what is to happen to a defendant acquitted in a federal court, by reason of insanity. In this connection reference has been made to a "regrettable void' in the law. See Sauer v. United States, 9 Cir., 241 F.2d 640, 651, and footnote 32, and Buatte v. United States, 9 Cir., 330 F.2d 342, 347, footnote 3. Had this defendant here made a record, and taken proper exceptions on his request to prove the avail-

ability of mental treatment by the Navy, he might have a persuasive point.

2. Counsel can hardly expect a hard-driven trial judge to deal with the fine question here raised in the absence of a clearly stated objection. Absent such an objection, there is a waiver. This thought was well stated by the inimitable Judge Lamm in Bragg v. Metropolitan Street R. Co., 192 Mo. 331, 91 S.W. 527, as follows: "It has not hitherto been allowed

ror in the language used by counsel in addressing the jury. It is said that the argument was unfair and erroneous in this particular case because the defense was insanity and the jury verdict might well be affected by its notions as to whether a not guilty verdict would merely put the defendant at large and in a position to commit further crime.

I need not reach the question as to whether the insanity defense makes this a special case. Assuming that the language used in argument here was prejudicial, yet I am satisfied appellant cannot make such a contention on this appeal.

It is elementary that in the trial of criminal cases, as well as in civil cases, a party must make known to the court "his objection to the action of the court and his grounds therefor." [3] Such is the requirement with respect to a claim of misconduct of counsel. Devine v. United States, 9 Cir., 278 F.2d 552, 556; Orebo v. United States, 9 Cir., 293 F.2d 747, 749; Pacman v. United States, 9 Cir., 144 F.2d 562.

It is easy enough for us, sitting where we do, to evolve an esoteric theory that a defense of insanity makes impermissible what would ordinarily be acceptable and expected. But cases have to be tried by district judges, whose rulings generally must come on the spur of the moment, and on the spot. The question as to whether the suggested distinction (in a case when insanity is the defense) is a valid one seems to me to be a very close one. After all, the jury by itself would know that "not guilty" would mean defendant's release, And what the prosecutor said was no more than that. If the situation presents special factors it is the duty of counsel not only to object, but, as

stated in Rule 46, to state the "grounds therefor."

There were two occasions here when counsel was confronted with this duty. The first was when the court said to the prosecutor: "Oh yes, I will permit you to do that." The second was when the argument was made. At neither time did counsel object. As Judge Clark noted in Reck v. Pacific-Atlantic S.S. Co., 2 Cir., 180 F.2d 866, 870, there is reason for such a timely objection "[S]ince it could and undoubtedly would have led to an immediate correction of whatever error of form may have been disclosed."

Had the defense made an objection on the first occasion mentioned above, it would not have been necessary to repeat it. See People v. Terry, 57 Cal.2d 538, 21 Cal.Rptr. 185, 370 P.2d 985, 1003. But no objection was ever made, no grounds as to the impropriety of this argument was ever suggested. Under these circumstances the defendant waived the objection now sought to be urged.

The majority opinion, after alluding to the point here made, attempts to justify its conclusion by applying Rule 52 (b), the "plain error" rule. That is a rule properly resorted to, in the words of Judge Sanborn, when there have been "plain and vital errors." (Page v. United States, 8 Cir., 282 F.2d 807, 810.) The standard, sound rule, for the application of the plain error rule was also stated by Judge Lindley for the court in United States v. Vasen, 7 Cir., 222 F.2d 3, 4–5, as follows: "We must not lightly invoke Rule 52(b) * * * only seriously prejudicial error will be noticed, in the absence of objection." The error here, if any, was neither plain nor vital. If anything is clear, it is that neither the

to a 'nisi prius' judge—a 'puisne' judge
—to have been so successful in
 'Mastering the lawless science of our law,
 That codeless myriad of precedent,
 That wilderness of single instances,'
—that he has the whole body of the law at his fingers' ends, so to speak, for instantaneous and automatic application, ex mero motu, without having his attention directed by counsel to some specific

legal principle or some specific fact controlled by such principle. Only appellate courts, it is modestly believed, are so endowed, and even this has been a subject of sharp discussion and possible doubt, and, peradventure, should be stated cautiously and taken 'cum grano salis.' "

3. The quoted language is from F.R.Civ.P. Rule 46.

judge nor either of the parties considered the argument erroneous or prejudicial at the time.

On the whole, and on balance, fairness to all parties, Government and defendant alike, is guaranteed by an adherence to standard rules of procedure. Surely it is the duty of this court to respect the needs of an effective judicial system. Any chance ruling which reaches a disorderly result, one which is reached in disregard of all standards of proper procedure, is a disservice to our system, and to all litigants.

If the plain error rule is to be resorted to in such non-vital cases as this, all rules requiring objections may as well be thrown away. Just because the appellate court observes something in the trial to which, in its opinion, objection could have been made, no reason is furnished for applying a rule of "plain error."

The wording of the majority opinion leaves me in some doubt as to whether the result reached is based in any degree on the admission of the testimony of the newspaper reporters. At one place the opinion states with respect to the interview with the newspaper reporters: "Did the interview violate Evalt's constitutional right? We have reluctantly concluded that it did not." The opinion then notes that Evalt willingly talked to reporters and that he was told that he did not have to talk to them. At another place in the opinion it is stated: "We hold that the testimony of the reporters should not have been received. * * * Our holding is that the government may not use evidence obtained in the way that this evidence was obtained. It is urged that, if inadmissible, the testimony was harmless, in view of the other testimony in the record, and particularly of the fact that Evalt admitted what he did and based his whole defense upon insanity. We do not pass upon this question, because the judgment must be reversed for other reasons, as is shown hereafter."

In view of the fact that the appellant with apparent eagerness undertook to make confessions of the events to every one in sight who would listen and in view

of the nature of the defense interposed at the trial, I cannot believe that the receipt of the newspaper men's testimony was so prejudicial as to require reversal here.